James C. PARSONS, Appellant,

v.

Margaret M. HECKLER, Secretary of Health and Human Services of United States of America, Appellee.

No. 83–2666.

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1984.

Decided July 24, 1984.

James D. Leach, Rapid City, S.D., for James Parsons.

Philip N. Hogen, U.S. Atty., Rapid City, S.D., for appellee.

Before BRIGHT, Circuit Judge, HENLEY, Senior Circuit Judge, and BOWMAN, Circuit Judge.

BOWMAN, Circuit Judge.

James C. Parsons appeals from the Secretary's denial of his application for Social Security disability benefits under 42 U.S.C. §§ 423, 416(i). The District Court affirmed the Secretary's denial of benefits. As we find the Secretary's conclusion unsupported by substantial evidence, we reverse.

## I. *Facts*

Parsons filed for disability benefits on March 5, 1982. His claimed disability was for mental illness beginning in May 1979 and continuing to the present.[1] Parsons' application for disability benefits was denied. Parsons appealed and a hearing was held before an administrative law judge (ALJ) on December 13, 1982. The ALJ denied disability benefits because he found Parsons was not disabled as of June 30, 1981—Parsons' last day of insured status for disability benefits.[2]

---

1. Simultaneously, Parsons filed an application for supplementary security income (SSI) benefits for the same period. The claim for SSI benefits was granted, as the ALJ found Parsons suffering from a disability which began on March 5, 1982.

2. A claimant's insurance coverage for disability benefits (insured status) continues as long as he meets the minimum earnings requirements un-

der those provisions. The claimant here last met those requirements on June 30, 1981. It is well-settled that the claimant must have been disabled within the meaning of the Social Security Act on or before expiration of his insured status in order to be eligible for benefits.

Unlike disability benefits, there is no insured status requirement for SSI benefits. The benefit levels under the SSI provisions, however, are

Parsons is thirty-four years old and has three undergraduate degrees, the most recent being a degree in Pharmacy which he received in 1977. After graduation, he worked as a pharmacist for six months before being fired in 1978. During the three years after losing his job as a pharmacist, Parsons was employed sporadically, and earned only $281.54 for 1980 and 1981, and had no income in 1979. Parsons consistently expresses a desire to keep and hold employment, but the record shows that he has been unable to do so.

The first medical record indicating Parsons' mental problems is a letter written by Dr. Roger P. Millea on March 16, 1979 referring Parsons to a psychiatrist. Designated Record (D.R.) at 76. In that letter Dr. Millea stated that Parsons "was probably suffering from paranoid schizophrenia" and that Parsons had been attending counseling sessions at Lutheran Social Services in Rapid City.

On August 26, 1980, Parsons was admitted to the Human Services Center (Center), which is a mental hospital in Yankton, South Dakota. A history and physical examination of Parsons was taken on September 15, 1980. This history notes that Parsons had an obsession that he was afflicted with a painful urinary tract infection. The history indicates Parsons had been seeing Dr. Donald W. Burnap, a psychiatrist, for about one year preceding his admission to the Center.[3] Dr. Burnap prescribed stelazine[4] to alleviate the pain Parsons suffered in his urinary tract. The history indicates that as of September 15, 1980, the differential diagnosis[5] of Parsons' mental condition was as follows:[6] (1) psychogenic pain disorder,[7] (2) conversion disorder,[8] (3) hypochondriasis,[9] (4) atypical somatoform disorder,[10] (5) atypical factitious disorder,[11] (6)

much lower than under the disability provisions.

3. Dr. Burnap later wrote a letter which served as the basis for the ALJ's decision awarding SSI benefits to Parsons. *See* discussion, *infra.*

4. A drug used for control of manifestations of psychotic disorders. Also used to control anxiety and tension associated with somatic conditions. *Physician's Desk Reference* at 1910 (37th Ed.1983).

5. The first set of six disorders are the product of a "differential diagnosis." This initial diagnoses indicates a "range" of disorders from which the patient may be suffering. Such diagnoses are used because many disorders have symptoms which are very similar, and at early stages of treatment a therapist may have insufficient information to determine which specific disorder is present.

6. The mental disorders referred to in the text are defined in the American Psychiatric Association's, *Diagnostic and Statistical Manual of Mental Disorders* (3rd ed. 1980) (DSM–III). The definitions used in this opinion are condensed from that volume. For additional information, *see* DSM–III at pages indicated.

7. The patient complains of pain that cannot be traced to a physical origin. Such pain may mimic a specific disease, in this case a venereal disease or urinary tract infection. DSM–III at 247.

8. The patient manifests a psychological problem or conflict as a physical limitation, *e.g.,* blindness, paralysis of an arm or another disorder occurring as an outgrowth of a psychological problem. DSM–III at 244.

9. The patient unrealistically interprets physical signs or sensations as being abnormal. As a result, the patient becomes preoccupied with the fear or belief that he has a serious physical disease. DSM–III at 249.

10. The patient's physical symptoms suggest a serious disease but there are no organic findings. This disorder is distinguished from psychogenic pain disorder in that it does not necessarily focus on pain as the primary complaint, but may focus on another problem, such as a perceived disfiguring physical feature. DSM–III at 241, 251–52.

11. The patient has physical or psychological problems which are under "voluntary" control. DSM–III gives the following explanation of the voluntary character of a factitious disorder.

The judgment that the behavior is under voluntary control is based, in part, on the patient's ability to simulate illness in such a way that he or she is not discovered. This involves decisions as to timing and concealment that require a degree of judgment and intellectual activity suggestive of voluntary control. However, these acts have a compulsive quality, in the sense that the individual is unable to refrain from a particular behavior, even if its dangers are known. They should therefore be considered 'voluntary' in the sense that they are deliberate and purposeful,

schizoid personality disorder,[12] and (7) avoidant personality disorder.[13] D.R. at 86.

A psychologist at the Center examined Parsons on September 19, 1980 and prepared an evaluation of Parsons' mental condition. This evaluation records Parsons' obsession that he suffered from venereal disease, which he believed to be the source of his urinary tract pain. This obsession had lasted for at least six years, during which he had seen numerous doctors who refuted his self-diagnosis. Parsons' mother reported her observation of "irrational behaviors, argumentative behaviors and depression" in Parsons. *Id.* at 91. While tests indicated that Parsons' intelligence was within the average range, the subtests on the intelligence tests used showed considerable variation in scores. The evaluation attributes this variation to anxiety, depression, and diminished judgment. The evaluation concluded that Parsons demonstrated "both poor judgment and intellectualization and this appears related to his doubt about what to do in social situations." *Id.* at 92. The evaluation also noted:

> His reality testing is good except in situations where affect is present. Then the patient no longer exercises good judgment and he is not able to control his emotional experience. He has an intense self-focus which interferes with interpersonal situations. It is likely that in social situations this patient really isn't aware of his impact on other people because he's concentrating on his own train of thought or fantasy. This may in part explain why he seems disjointed in conversations. He may be disregarding what another is saying to him, at least in part, and racing on with his own interpretation.

> *Because of the amount of painful affect, anxiety, and frustration this patient has suicide potential.* He is currently engaged in a rigid defensive effort with almost complete paralysis of affect.

*Id.* (emphasis added).

A social history and assessment taken on September 22, 1980 noted that Parsons was in contact with the West River Mental Health Center in Rapid City in 1978 and 1979. This assessment also states that Parsons had been fired from the three jobs that he had held—as a computer operator, as a lumber yard worker, and as a pharmacist. *Id.* at 89–90.[14]

Parsons was discharged from the Center on September 30, 1980. The discharge summary noted that although Parsons was intelligent, he was defensive about his psychiatric problems and became anxious and denied such problems whenever confronted with them. The final diagnosis on discharge included: (1) psychogenic pain disorder,[15] and (2) adjustment disorder with depressive symptomatology.[16] Although the patient was urged to seek psychiatric counseling on a regular basis with the West River Mental Health Center, the report concluded in its discharge planning section that "his resistance to [psychiatric counseling dims] the prognosis significantly." *Id.* at 94.

On December 14, 1981, about six months after the date his insured status ended,

---

but not in the sense that the acts can be controlled. Thus, in Factitious Disorders, behavior under voluntary control is used to pursue goals that are involuntarily adopted. DSM–III at 285. In a factitious disorder, there is no apparent reason for the imagined illness or problem. DSM–III at 290.

12. The patient shows indifference to praise, criticism or feelings of others, and shows little or no desire for social involvements. These individuals tend to be cold and aloof. DSM–III at 310–11.

13. The patient desires to enter social relationships but because of a hypersensitivity to rejec-

tion, tends to remain socially isolated. DSM–III at 323–24.

14. Parsons' social security application form indicates that he held other jobs at various times during summers and while in school. D.R. at 48.

15. *See supra* note 7.

16. The patient has a problem in adjusting to social situations which manifests in a depressed mood, tearfulness or hopelessness. DSM–III at 301.

Parsons returned to the Center. Parsons reported that he had been working as a manager for the past fifteen months, *Id.* at 95, but his earnings history reveals that he earned a total of $281.54 during the years 1980 and 1981. *Id.* at 71. He complained again of urinary tract pain. As before, Parsons presented a good image of himself at the admitting interview. The admitting report notes that Parsons was cooperative, friendly, and well-oriented as to time, place, and person and that his speech was coherent and relevant. The report further noted, however, that "he is obviously preoccupied about a GU [genital urinary] problem and the infection of the throat" both of which the report stated were considered to be obsessional or delusional in nature. *Id.* at 99. The diagnosis at this time was that Parsons had the following disorders: schizophrenia paranoid type,[17] compulsive personality,[18] and schizoid personality.[19] These diagnosis remained the same when Parsons was released on January 12, 1982. *Id.* at 105.

Parsons entered an adult day treatment program at the West River Mental Health Center on January 19, 1982. Parsons applied for disability insurance benefits on March 5, 1982. On May 5, 1982 Parsons was examined by Dr. Burnap at the request of the Social Security Administration. Dr. Burnap found Parsons to be suffering from chronic undifferentiated schizophrenia and mixed schizoid and obsessive-compulsive personality disorders. Dr. Burnap recommended that Parsons be given disability benefits. D.R. at 108–09.

## II. *Discussion*

■ If the Secretary's decision is supported by substantial evidence, it is affirmed. *See, e.g., Brand v. Secretary of Health, Education and Welfare,* 623 F.2d 523, 527 (8th Cir.1980). Substantial evidence is defined as "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Smith v. Schweiker,* 728 F.2d 1158, 1162 (8th Cir. 1984). The substantial evidence test is more than a mere search of the record for evidence supporting the Secretary's finding. "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The claimant has the burden of proving that he or she is disabled within the meaning of the statute. Once the claimant has established an inability to return to his past relevant work, the burden of going forward with evidence shifts to the Secretary to show other jobs in the economy that the claimant is capable of performing. Where an exertional impairment is demonstrated, the Secretary may fulfill this burden by reference to the medical-vocational guidelines contained in the Secretary's regulations. 20 C.F.R. Section 404, Subpart P, Appendix 2; *McCoy v. Schweiker,* 683 F.2d 1138, 1141 (8th Cir.1982). The Secretary may not rely on these guidelines if the record indicates that the claimant suffers from a nonexertional impairment. 683 F.2d at 1148. In such cases, and in cases of exertional impairments which do not fit within the guidelines, the Secretary must use vocational expert testimony or other similar evidence in order to meet her burden of showing there are jobs in the national economy which the claimant is capable of performing. *Id.*

■ It is apparent from the record that the ALJ found Parsons to be incapable of returning to his past relevant work as a pharmacist. D.R. at 11. After making this finding, the ALJ should have shifted the burden of going forward with evidence

17. The patient manifests persecutory or grandiose delusions often associated with anxiety, anger, jealousy or argumentativeness. The manner of speaking may be stilted and overly formal. DSM–III at 191.

18. This disorder features a freezing out of warm emotions. The individual is preoccupied with rules and details, but allocates time poorly and is very inefficient. The individual wants others to conform to his way of doing things. DSM–III at 326–27.

19. *See supra* note 12.

to the Secretary to demonstrate, through vocational expert testimony, jobs in the national economy which the claimant was capable of performing. *See Smith, supra.* This, however, was not done. The ALJ terminated his analysis with a finding that Parsons was not severely impaired.

■ The Secretary argues that the court may not consider any medical, psychological, or psychiatric evaluations made after the expiration of the claimant's insured status. We do not agree. While the Secretary is correct insofar as she contends that such evaluations must relate to the claimant's condition prior to the expiration of his insured status, the mere fact that the examination was made following the expiration of insured status does not automatically make the examination irrelevant. In this case, there are strong correlations between the three most extensive psychological evaluations of Parsons, those of September 19, 1980, December 14, 1981 and May 3, 1982. While the conclusions of these evaluations are not identical, they all describe an individual with serious mental problems. All these evaluations must be considered in order to get a clear understanding of Parsons' mental condition as of June 30, 1981. *See Mann v. Richardson,* 323 F.Supp. 175, 177–78 (S.D.N.Y.1971) (total medical history may be considered to determine if condition existed prior to expiration of insured status); *DeNafo v. Gardner,* 272 F.Supp. 44, 46 (D.N.J.1967) (subsequent condition or event when taken together with evaluation of condition existing prior to expiration of insured status may be corroborative or indicative of true condition prior to expiration of insured status).

Parsons' job history provides strong evidence of the gap between his actual level of functional ability and his consistent presentation of himself as possessing strong potential. He was fired from his last full-time job as a pharmacist in 1978. After that he held only part-time employment as a laborer, earning less than $300 for 1980 and 1981, with no income in 1979. His pattern of defensive overstatement is also evident in his application forms for disability benefits. He consistently manifests a desire to find employment, yet the record attests to his inability to adjust to a work setting. While in his application form of March 5, 1982, he indicates that his earnings for 1981 were approximately $2,000, D.R. at 38, his actual earnings for that year were $30.17. *Id.* at 71. In that application he reported that his employment for 1980 and 1981 was as a laborer or as a janitor, yet in his December 14, 1981 admission interview to the West River Mental Health Center he reported that he had worked as a "manager" for the last fifteen months.

■ The reports on his mental condition from September 19, 1980 onward show that Parsons' judgment, social skills and insight into his mental problems were impaired. His performance and manner during the May 3, 1982 examination by Dr. Burnap were not significantly different from his performance and manner during his two periods in residence at the Human Services Center. The psychiatric evaluations, together with Parsons' ineffective attempts to obtain and hold employment, lead us to the conclusion that Parsons was disabled within the meaning of the Social Security Act and within the meaning of the Secretary's regulations. Indeed, the ALJ conceded that Parsons had "significant mental impairments," prior to the expiration of Parsons' insured status. *Id.* at 11. The ALJ erred in focusing almost solely on Parsons' somatic urinary tract pain disorder, while discounting or ignoring his problems of defensive overstatement, depression, impaired judgment, poor social skills, and inability to hold a job.

■ The Secretary's determination regarding the ability of a claimant to perform jobs in the national economy must take into account the actual ability of the claimant to find and hold a job in the real world. As one court has stated, in selecting employees "[e]mployers are concerned with substantial capacity, psychological stability, and steady attendance; they will not unduly risk increasing their health and liability insurance costs" by hiring a person with serious physical or mental problems. *Thomas v. Celebreeze,* 331 F.2d 541, 546 (4th Cir.1964) (cited with approval in

*Rhines v. Harris*, 634 F.2d 1076, 1079 (8th Cir.1980)). The Secretary's decision, therefore, must take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes. *Cf. Tennant v. Schweiker*, 682 F.2d 707, 710 (8th Cir.1982). In *Tennant*, the claimant suffered from a personality disorder known as inadequate personality, which prevented him from holding a job for any sustained period of time. In *Tennant* this court found the claimant's demonstrated inability to hold a job particularly relevant. The court stated:

> Tennant has held *forty-six* jobs in his twelve years of employment. His longest tenure at any job was six months. It appears that he has been fired from most of these jobs.
>
> Tennant has consistently demonstrated a desire to be gainfully employed but has met with little success. He has been through a number of job training programs, but has never progressed in them to the satisfaction of his supervisors. His experience in the "real world" has been no better.

*Id.* at 710.

While Parsons suffers from a different personality disorder from that of Tennant, his pattern of defensive overstatement is quite similar to that of Tennant. Parsons consistently presents a strong desire for personal advancement and gainful employment, yet his work history demonstrates his inability to hold a job.

■ As we find Parsons to be disabled on the basis of the record, we must now turn to the question of remedy. If the record as presented to the ALJ contains substantial evidence supporting a finding that the claimant was disabled, then a reviewing court may reverse and remand the case to the District Court for entry of an order granting benefits to the claimant. *See, e.g., Baugus v. Secretary of Health and Human Services*, 717 F.2d 443, 448 (8th Cir.1983); *Nelson v. Heckler*, 712 F.2d 346, 349 (8th Cir.1983); *Tennant*, 682 F.2d at 710–11; *Zimiga v. Schweiker*, 651 F.2d 611, 613 (8th Cir.1981). In this case, Parsons has been consistently diagnosed at least since September 19, 1980 as having severe social and adjustment problems. If we remanded this case to the Secretary for vocational expert testimony regarding jobs which Parsons might have been capable of performing during the period between September 19, 1980 and July 1, 1981, such testimony would not erase or change the clinically observed and functionally corroborated fact that Parsons was mentally incapable of holding any job during that period. Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate. *Tennant*, 682 F.2d at 710.

■ Parsons' demonstrated inability to retain employment, together with his chronic pattern of defensive overstatement, poor judgment, lack of insight, and weak social skills, all as diagnosed on September 19, 1980, and corroborated by his work history and by subsequent psychiatric evaluations, lead us to the conclusion that the ALJ erred in failing to find that Parsons has been disabled since September 19, 1980 at the latest. We remand this case to the District Court with directions to enter judgment for Parsons awarding him disability benefits under 42 U.S.C. § 423 as of March 5, 1981.