Eddie **SINGLETARY**,
Plaintiff-Appellant,

v.

Otis R. **BOWEN**, M.D., Secretary of Health and Human Services,
Defendant-Appellee.

No. 85–3799
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Aug. 29, 1986.

Robert Madden Hill, Circuit Judge, filed concurring opinion.

---

Edward J. Cloos, III, New Orleans, La., for plaintiff-appellant.

Nancy A. Nungesser, Asst. U.S. Atty., New Orleans, La., John M. Gough, Atty., Dallas, Tex., for defendant-appellee.

Before GEE, REAVLEY and HILL, Circuit Judges.

REAVLEY, Circuit Judge:

Eddie Singletary appeals the district court's grant of summary judgment in favor of the Secretary of Health and Human Services affirming the denial of his application for disability benefits. We reverse.

## Facts

Eddie Singletary is twenty-nine years old. He has completed the tenth grade and received his GED. He has also been in and out of several trade schools. For more than ten years, he has led a wandering, nomadic existence, travelling back and forth between Texas, Mississippi and Louisiana and living in hospitals, bus stations, missions, the woods and the homes of relatives. He has been sporadically employed, working for various intervals as a deckhand, roustabout, rigger, or galley-hand. He has also worked for short periods of time at painting, plumbing, carpentry, airconditioning, refrigeration, machine shops, loading and unloading trucks, and dishwashing. He has spent considerable amounts of time in various hospitals and mental institutions.

The doctors who have examined Singletary, and there have been many, have differed in their evaluations, diagnosing him at different times as suffering from schizophrenia, various psychoses, delusions, an antisocial personality, an inadequate personality, and a passive-aggressive personality. While they differ in their diagnoses, the doctors concluded that Singletary has serious, long-term mental impairments.

In 1982, Singletary applied for social security benefits, claiming that he was disabled due to his mental condition. His application was denied both initially and on reconsideration. In 1984, a hearing was conducted before an administrative law judge (ALJ), who recommended a finding of no disability. Singletary's request for review was rejected by the Appeals Council, and the ALJ's decision became the final decision of the Secretary of Health and Human Services. The district court, upon recommendation of a magistrate, determined that the Secretary's determination was supported by substantial evidence, and granted summary judgment in favor of the Secretary.

## Discussion

An individual is disabled under the Social Security Act only when he has a physical or mental impairment which has lasted or can be expected to last for at least 12 months and which is so severe that the claimant is unable to engage in substantial gainful employment. 42 U.S.C. § 423(d)(1)(A) (1982); 20 C.F.R. § 404.1505 (1985). Substantial gainful activity is work that involves significant and productive activities for pay or profit. *Id.* § 404.1510. To determine whether an impairment is so severe that it prevents a claimant from pursuing any gainful activity, the Secretary is required to engage in a five-step sequential evaluation process. *Id.* § 404.1520(b)–(f).

First, if the claimant is already employed, disability benefits are denied regardless of the severity of the impairment. Second, if the individual is not working, the Secretary must determine whether the claimed impairment is "severe." *See id.* § 404.1521. If the impairment is severe, the Secretary must determine whether the impairment is so severe that the claimant is presumed to be unable to pursue any gainful activity. This determination is made by comparing the impairment to a specific Listing of Impairments. *See id.* § 404, Subpart P, Appendix 1. If the claimant's impairment does not fall within the Listing of Impairments, the Secretary must determine whether the individual has a sufficient "residual functional capacity" to perform the kind of work he did in the past. *See id.* § 404.1545. Fifth, if the individual is unable to do past relevant work, then the Secretary must determine, based on the individual's age, education, work experience and residual functional capacity, whether the claimant can perform any other work which exists in the national economy. *See id.* § 404.1566.

Determining whether a claimant is disabled because of a mental condition under the above sequential process can be a difficult task. In some cases, the mental im-

pairment may be so severe that the claimant is presumed to be incapable of working. *See, e.g., Moore v. Secretary of the United States Dept. of Health and Human Services,* 778 F.2d 127 (2d Cir.1985) (finding that the claimant was disabled under the Listing of Impairments). Quite often, however, the claimant is capable of finding a job and working for short periods of time. The nature of the mental impairment is such, however, that the claimant is unable to remain employed for any significant period of time. Such circumstances raise two important questions. First, does the impairment meet the 12 month duration requirement? Second, is the impairment so severe as to prevent the claimant from engaging in substantial gainful activity? These questions are to a certain extent intertwined, and this has caused some confusion, confusion which was evident in this case.

### I. *The Durational Requirement*

■ The ALJ concluded that Singletary's mental condition "does not appear to have been severe enough to have prevented substantial gainful employment for more than short periods of time—far less than twelve continuous months." This finding evidences a misunderstanding of the duration requirement. It confuses the duration requirement, which applies only to the impairment, with the severity requirement, which determines whether the impairment prevents the claimant from working.

The Social Security Act defines "disability" as the

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A) (1982). The statute quite clearly requires that it is the impairment only which must last for a continuous period. Normally, of course, when a claimant has an impairment severe enough to prevent him from working, he will be un-

able to work for as long as the impairment lasts. This is particularly true when the impairment is physical. The statute, however, does not *require* that a claimant be unable to engage in work during the entire 12 month period. *See also* 20 C.F.R. §§ 404.1505(a); 404.1509; 404.1510. The ability of a claimant to engage in work for limited periods of time certainly calls into question the severity of the impairment, but it does not necessarily determine whether the impairment, however severe, has lasted for at least 12 months.

While a claimant need only show that an alleged impairment has lasted or can be expected to last for the 12 month period to meet the duration requirement, a claimant alleging a mental impairment may face a difficulty not presented in cases involving physical impairment. As one court has stated,

While the mere existence of symptom-free periods may negate a finding of disability when a physical impairment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of the claim. Unlike a physical impairment, it is extremely difficult to predict the course of mental illness. Symptom-free intervals, though sometimes indicative of a remission in the mental disorder, are generally of uncertain duration and marked by an impending possibility of relapse. Realistically, a person with a mental impairment may be unable to engage in competitive employment, as his ability to work may be sporadically interrupted by unforeseeable mental setbacks.

*Lebus v. Harris,* 526 F.Supp. 56, 61 (N.D. Cal.1981).

■ Because of such considerations, the courts which have considered the question have concluded that a claimant whose claim is based on a mental condition does not have to show a 12 month period of impairment unmarred by any symptom-free interval. *See, e.g., Miller v. Heckler,* 747 F.2d 475, 478 (8th Cir.1984); *Dreste v. Heckler,* 741 F.2d 224, 226 n. 2 (8th Cir.1984). We agree with the assessment of these courts.

A finding that a claimant has a mental impairment which manifests itself from time to time over a long-term period is not inconsistent with the language of the statute, which requires that an impairment last "for a continuous period of 12 months." 42 U.S.C. § 423(d)(1)(A) (1982); *see also* 20 C.F.R. § 404.1509. Of course, as required by the regulations, a claimant must present medical evidence which indicates that his mental condition is a long-term problem and not just a temporary set-back. *See* 20 C.F.R. § 404.1508.

■ In this case, there is no question but that Singletary presented such evidence. With years of visits to hospitals and numerous diagnoses of mental problems, Singletary's impairment unquestionably lasted for more than 12 months. Moreover, the doctors who saw Singletary all determined that his problems involved long-term difficulties. There can be no doubt, therefore, that Singletary met the duration requirement.

## II. *Substantial Gainful Activity*

The ALJ determined that Singletary was suffering from a personality disorder. The ALJ also concluded, however, that Singletary was able to engage in substantial gainful activity because he was capable of performing work, such as dishwashing, which he had done in the past. In reaching this conclusion, the ALJ ignored one very important aspect of Singletary's mental condition: the extent to which his condition prevented him from maintaining regular employment.

■ A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time. *See Parsons v. Heckler,* 739 F.2d 1334, 1340 (8th Cir. 1984) ("the ability of a claimant to perform jobs in the national economy must take into account the actual ability of the claimant to find *and* hold a job in the real world")

(emphasis added); *Tennant v. Schweiker,* 682 F.2d 707, 709–10 (8th Cir.1982) (where individual bases his claim on a personality disorder, "the dispute focuses on whether the claimant has the emotional capacity to engage in sustained employment"). A determination that a claimant is unable to continue working for significant periods of time must, however, be supported by more than a claimant's personal history; it must also be supported by medical evidence. *See* 20 C.F.R. §§ 404.1546; 404.1560.

■ There was substantial evidence to support Singletary's claim that he was unable to hold a job. His personal history indicated that he was never able to hold a job for long periods of time. He testified that even his relatives would not employ him as they claimed that he did more harm than good. As indicated earlier, all the doctors who examined Singletary had determined that he suffered from various mental disorders. In their reports, they discussed his poor judgment, his inability to relate socially, his antisocial tendencies, and his poor insight. Dr. Thomas Roach, of the Southeast Louisiana Hospital, determined in 1978 that Singletary's prognosis was "poor ... he will no doubt be back." Another doctor concluded that Singletary was an antisocial personality who "was not as successful as most because he had less intellectual endowment." Most recently, in 1984, Dr. Louis Provenza stated that "[d]ue to his diagnosis of a schizoid type personality disorder, it is doubtful that the patient may be able to return to employment."

■ Despite the substantial, indeed overwhelming, evidence in support of Singletary's claim, the ALJ based his conclusion that Singletary could engage in substantial gainful activity on determinations by some of the doctors that Singletary was "employable." Of course, conflicts in the evidence, including those arising in medical opinions, are to be resolved by the Secretary, *Laffoon v. Califano,* 558 F.2d 253, 254–55 (5th Cir.1977), and we must uphold the Secretary's determination if it is supported by substantial evidence. But the

substantial evidence test does not involve a simple search of the record for isolated bits of evidence which support the Secretary's decision. We must consider the record as a whole, *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir.1985), and " '[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight,' " *Parsons*, 739 F.2d at 1339 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)).

We think that when the record as a whole is considered the conflict between the medical opinions over whether Singletary is "employable" is more apparent than real. Dr. Boudreaux examined Singletary numerous times from 1977 to 1983 while Singletary was at the Mississippi VA Hospital. In his last report, written in September 1983, Dr. Boudreaux concluded that Singletary is "an inadequate personality with periodic alcohol and drug abuse that leads to transient psychotic episodes in a person with low average intelligence, who has had some diffuse brain damage, has had a nomadic life and who had a chaotic rearing." He listed Singletary as "employable," but he also stated that Singletary is a "very inept person who will probably always have *vocational*, social and interpersonal *problems*" (emphasis added). Similarly, in a report written in October 1982, Dr. Frank Covington concluded that Singletary could engage in gainful employment "at the present time." Dr. Covington also stated, however, that Singletary's judgment was impaired, his insight into his problems was poor, his ability to relate to others was impaired, and he suffered from "moderate restriction of daily activities, moderate deterioration in personal habits, and moderate constriction of interests." According to Dr. Covington, Singletary's prognosis was "guarded."

These reports clearly indicate a determination by both doctors that Singletary could find and physically perform certain jobs. Such a finding is also supported by his personal history. But it is at least questionable whether these reports would support a finding that Singletary could remain employed for significant periods of time. Indeed, Dr. Boudreaux's conclusion that Singletary would always have vocational problems and Dr. Covington's conclusion that Singletary could maintain employment at the present time may contradict such a finding. The concern which these doctors expressed over Singletary's ability to remain employed indicates that their opinions of his "employability" were not in conflict with Singletary's other medical records or his personal history.

When viewed as a whole, Singletary's history presents the picture of an individual living a tragic, chaotic personal life who has been unable to remain employed for more than limited periods of time. He has been hospitalized repeatedly over a long period of time for psychiatric problems, and the record is replete with discussions of his inappropriate behavior and poor social adjustment. Based on such a record, we are not satisfied that substantial evidence supports a determination that Singletary could obtain *and maintain* employment, or that this was the finding of the ALJ.

We reverse the judgment of the district court affirming the decision of the Secretary. We remand to the district court with instructions to remand the case to the Secretary for reconsideration in accord with this opinion.

REVERSED and REMANDED.

ROBERT MADDEN HILL, Circuit Judge, concurring:

Because I agree with the majority's conclusion that the ALJ used incorrect legal standards in applying the durational requirement and the substantial gainful activity test, I concur. I write separately, however, to emphasize my view—one which I believe is shared by the other panel members—that on remand the ALJ is free to exercise his discretion anew in applying the proper formulation of these legal standards to the facts of this case. I also take this opportunity, in light of our remand, to

relate below an alternate perspective of the record of Singletary's impairment.

### I. The Documentary Record

An amplification of the record discloses an evidentiary basis for the ALJ to reach the same conclusion of no disability, even if correct legal standards are applied. The reports of several physicians indicate that Singletary's impairments may not be so severe as to prevent him from finding and maintaining employment. Again, I emphasize these portions of the record not in an effort to control the ALJ's decision on remand, but rather to indicate that the ALJ is left free to make his own initial independent determination.

### A. Dr. Boudreaux

The earliest record of psychiatric care appears to be an examination by Dr. Boudreaux of the Veterans Administration ("V.A.") in June 1977. Singletary was diagnosed as grossly psychotic and catatonicly schizophrenic. However, Dr. Boudreaux's later examination in October 1982 revealed this as "a mistaken diagnosis," for he concluded that the 1977 incident was "a drug abuse and withdrawal disorder as Dr. Lessman then suspected." Singletary confirmed this, referring to this incident, "Oh, that was the time I was flipped out on drugs." Singletary was now "alert, aware, [had] affect" and did not "show any covert or overt signs of thought disorder or depression." Dr. Boudreaux found "no need for psychiatric hospital or no available psychiatric RX." There was "no illness to treat." He was "not mentally ill." Dr. Boudreaux reported that "Mr. Singletary had no home or job and this is why he got himself admitted." Dr. Boudreaux concluded: "I see no signs or symptoms of schizophrenia," and discharged him "regular, competent, able to work."

Dr. Boudreaux's conclusions were reinforced in August 1983 upon further examinations and the administering of a battery of psychological tests. He found that "the tests do not indicate any great difficulty at this time, either psychologically with a thought disorder, or with brain damage, to any significant degree." Dr. Boudreaux again concluded that "there is *no* schizophrenic illness," (emphasis in original), diagnosing Singletary as "Passive-Aggressive Personality," and finding him "Employable." Dr. Boudreaux's conclusions are particularly significant because he apparently has been one of the psychiatrists who has seen Singletary over the longest period of time with some degree of continuity.

### B. Dr. Roach

In February 1978 Singletary was examined by Dr. Roach of the Southeast Louisiana Hospital. At the hospital Singletary "entered smiling stating that he went home and argued with his family and that is why he came here." He exhibited "no motivation at all," but was "not psychotic." Singletary had "vague paranoid ideations," was "oriented" but "very immature." Dr. Roach's "tentative" diagnosis was "schizophrenia, chronic undifferentiated type" and "drug abuse, mixed." Dr. Roach's report does not directly indicate whether Singletary was employable, but recommends that he be encouraged "to establish a stable job situation" as a "short term goal," implying that such a goal was attainable in the near future.

### C. Dr. Dill

Dr. Dill of the V.A. saw Singletary on three occasions mentioned in the record. In June 1980 Dr. Dill made a "provisional" diagnosis of schizophrenia "from history," apparently based on Dr. Boudreaux's earlier misdiagnosis. However, Dr. Dill observed him as having an appropriate mood, an organized thought content, a good memory, a good orientation, with no hallucinations or delusions. While in the hospital, Singletary "repeatedly touched female staff in an inappropriate manner," and "when he received a forty dollar check through the mail, he requested a discharge." Singletary was discharged as "employable."

In December 1980 Dr. Dill again found him "alert with no intellectual impairment ... cooperative and conforming," with normal affect and psychomotor activity, "logi-

cal and ... well oriented," and with a "good memory." He was admitted to the hospital because "he had begun drinking and lost his job." There was no psychosis or abnormal anxiety, and the diagnosis was changed to simply "antisocial personality." Dr. Dill recommended no followup treatment, terming Singletary "employable."

Dr. Dill saw Singletary a final time in June 1982 when he claimed that he had been living in the woods for six months, "ran out of medicine," and used alcohol to calm his nerves. Although his affect was flat and his psychomotor activity retarded, his speech was spontaneous and his associations logical and rational. He was cooperative and "socializing well," and discharged with a final diagnosis of antisocial personality and termed "employable."

### D. Dr. Covington

Dr. Covington wrote a fairly extensive report after his examination of Singletary in October 1982. Dr. Covington found Singletary alert, coherent, well-oriented and neither depressed nor euphoric. However, he was "manipulative" and "evasive." Although his judgment was "impaired," there were no gross psychotic manifestations, delusions, or phobias, and he could follow instructions, possessing "essentially average intellectual functioning...." Drawing largely from Singletary's history, Dr. Covington diagnosed "schizophrenia, simple type," but added that, based on his own observations, "I would not be surprised if he is at some point in the future determined to suffer from antisocial personality disorder." Dr. Covington concluded: "At either rate, in my opinion, he is capable of *maintaining* gainful employment at the present time" (emphasis added).

### E. Other Physicians

The record reflects that Singletary was examined in 1983 by at least four physicians, none of whom concluded that he was unemployable. Dr. England of the V.A. treated him in April for head injuries sustained in an automobile accident. Dr. England, apparently a neurosurgeon, reported no concrete examples of Singletary's behavior in referring to him as "obviously psychotic and threatening to those around him" upon admission. Singletary was transferred to the V.A. Psychiatry Service in "stable condition." A fragmentary report by Dr. Qazi states that he treated Singletary at the Slidell Memorial Hospital in May for an "extrapyramidal drug reaction." A June report from Dr. DeVillier of the Slidell Mental Health-Substance Abuse Clinic suggests that Singletary was transferred there on an out-patient basis from the V.A. Psychiatry Service. Dr. DeVillier found Singletary "oriented," not anxious, and discovered "no evidence of any psychosis or thought disorder." Dr. DeVillier reported that Dr. Boudreaux had initially diagnosed schizophrenia in 1977, but noted that Dr. Boudreaux himself later found this diagnosis erroneous. In August Singletary was treated by Dr. Chu of the V.A. Dr. Chu found him oriented and coherent, diagnosing a "mild" dementia associated with the head injury. Singletary was unemployed and admitted abusing alcohol, LSD, speed, and other drugs, but Dr. Chu found that "[o]therwise he appears to be functioning fairly well." Dr. Chu did not state an opinion of his employability, but was encouraged by the fact that Singletary appeared to have begun a job search.

### F. Dr. Provenza

The final entry in Singletary's medical record appears to be an examination by Dr. Provenza of the V.A. in January 1984. A C–T scan of the head ruled out the possibility of a recurrent epidural hematoma resulting from the head injury. Singletary complained of headaches, which were "relieved" by injections of normal saline solution. "When he did not have any headaching, he came up with some other complaints, such as having a knot on his head which, in fact, was the old surgical defect. The patient roamed the hospital freely from floor to floor and did not appear to be in any distress." Dr. Provenza's conclusions appeared to be based exclusively on the 1977 then-repudiated diagnosis by Dr. Boudreaux: "Due to his diagnosis of the schizoid-type personality disorder, it is doubtful that the patient may be able to

return to employment." Dr. Provenza did not elaborate on these conclusions.

## II. Singletary's Testimony

Singletary's testimony before the ALJ appeared rational and coherent. Asked about hallucinations, he answered:

Well,—sometimes, like when I'm walking along, like the other day, I was standing there by City Hall, and I was thinking, whether I ought to go by the VA Hospital, by the Mission, or by the bus station. I stood there and made up my mind, other than things like that happening, you know, nothing real major, you know—

He testified that "I get along with people, pretty good," although he had been in fights. He believed that "in general" people liked him, although he had had problems with relatives. He complained that "nobody will give me a job no more." However, when the ALJ asked him of his efforts to find employment, he was evasive and never responded to the question:

Q. Do you do anything at all, besides just walk around?

A. Not really.

Q. When was the last time you tried to work? tried to get a job?

A. Well, I help different ones of my relatives, do different stuff every now and then, you know, but most of the time, usually when I help one of them, they said, I do more harm, than I do good.

Various evidence in the record suggests that Singletary's principal problem may actually be motivational. A social worker reported that "he is without a job or a home and in his simplistic fashion he considers if he has pain he'll be taken care of." The record is also replete with evidence of Singletary's abuse of illegal drugs, and once he admitted to a social worker that he had been selling drugs in the 1970's. However, when asked once on a questionnaire "Do you feel that alcohol or drugs play any part in your present problems?" he answered "No." When taking the tests given for Dr. Boudreaux, Singletary interrupted the

questions of the female examiner with inquiries about her private life and off-duty time. However, with the other examiner, Singletary "tended to groan and complain continuously, stating 'my head hurts, my back hurts, I'm disabled....'" He was found sleeping at the testing table on three occasions.

In sum, I believe that the record would amply support either a finding of disability or a finding of no disability. The ALJ is entrusted with making a wise application of the correct legal standards to the facts of this case. Accordingly, with the above observations, I respectfully concur.