**Roslyn J. BIRD, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

No. Civ. 2:96–CV0841S.

United States District Court,
D.Utah,
Central Division.

March 22, 1999.

Carlie Christensen, Asst. U.S. Atty., District of Utah, Salt Lake City, UT, for plaintiff.

W. Paul Wharton, Utah Legal Services, Inc., Salt Lake City, UT, for defendant.

## ORDER

SAM, Chief Judge.

Roslyn J. Bird contests a decision of the Commissioner of Social Security, denying her application for supplemental security income under Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 1381–1383c. The matter is before the court on Mrs. Bird's motion to reverse or modify the administrative decision and the Commissioner's motion to affirm it.

### I. Standard of review

Federal courts are authorized to review whether the Commissioner's decision is supported by substantial evidence and based on correct legal standards. 42 U.S.C. § 405(g). "Substantial evidence" must be more than a "mere scintilla" of evidence but may be less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

Thus, the court's duty is to "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met" and correct legal principles applied. *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800–801 (10th Cir. 1991). A court must "neither reweigh the evidence nor substitute [its] judgment" for that of the administration. *Id.* at 800.

### II. The five-step disability evaluation

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The administration follows a five-step process in determining whether a claimant is disabled. 20 C.F.R. § 404.1520 (1998). The first step is to decide whether the claimant is currently engaged in "substantial gainful employment." *Id.* If so, the claim is denied without further evaluation.

The second step is to decide if the claimant's impairments are "severe." *Id.* If not, the claim is denied without further evaluation.

The third step is to decide whether medical findings about the claimant's impairments meet or equal the findings listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P. If so, the claim is granted without further evaluation.

The fourth step is to decide whether the claimant's impairments prevent him from performing his "past relevant work." 20 C.F.R. § 404.1520. If not, the claim is denied.

The last step is to decide whether the claimant could engage in other "substantial gainful activity," considering his age, education, and past work experience. *Id.* If not, the claim is granted.

### III. The administrative decision

At the time of the administrative hearing, Mrs. Bird was a 38–year–old woman with a high school education and some vocational training in electronics assembly. (R. 80 & 246–248.) She alleged disability since January 1, 1989, due to intestinal and back problems and depression. (R. 45 & 51.) She had prior work experience in electronics assembly. (R. 80 & 200.)

At the first step of the sequential evaluation, the administrative law judge (ALJ) found that Mrs. Bird had not engaged in substantial gainful activity since January

26, 1994. (R. 34, finding 1.) At the second step, he agreed she had "a severe impairment" but did not specify what the impairment was. (R. 32.) He did find medical evidence of "dysthymia, irritable bow[e]l syndrome with constipation, complaints of back pain, and possible carpal tunnel syndrome." (R. 34, finding 2.)

At the third step, the ALJ decided the medical findings of Mrs. Bird's impairments did not meet or equal any listed impairment. *Id.* He considered her testimony regarding the severity of her impairments "exaggerated because ... not supported by objective clinical testing of record." (R. 34, finding 3.) He found no exertional limitations on her capacity for work-related activities and only one non-exertional limitation: she could not follow complex instructions. (R. 34, finding 4.)

Since Mrs. Bird's prior work as an electronics assembler did not require her to follow complex instructions, the ALJ concluded at the fourth step that she could return to her past relevant work and therefore was not disabled. (R. 34, findings 5–7.)

### IV. Issues on appeal

Mrs. Bird's attorney argues that the ALJ's decision was not supported by substantial evidence and that the ALJ erred in discounting the opinion of a treating social worker, Mike Flowers, LCSW, who submitted his assessment on a Psychiatric Review Technique Form.

### V. Summary of the medical evidence

After reviewing the administrative record, the court agrees there is little evidence that Mrs. Bird has a disabling physical impairment.[1] According to the medical reports, she does have a "long history of recurrent ear infections" (R. 153; *see* R. 182–183, 199, 210), chronic irritable bowel symptoms (R. 182 & 187), and chronic peptic disease[2] (R. 151 & 161). But there

---

1. At the administrative hearing, Mrs. Bird's non-attorney representative conceded there were "few helpful medical exhibits" to show any physical impairment. (R. 245.)

2. An upper GI series in October 1989 showed no evidence of an active ulcer crater. (R. 151.)

is no evidence these impairments have limited her ability to perform work-related activities.

However, the medical reports show two serious mental impairments: an organic mental disorder and an affective or anxiety-related disorder. (R. 117.) The organic mental disorder is a "learning disability"; Mrs. Bird has "low average" intelligence and "borderline retarded" memory functioning.[3] (R. 119, 157–158.) The nature and severity of her affective or anxiety-related disorder are more difficult to assess.

Records from the Tooele Valley Regional Medical Center indicate Mrs. Bird was suffering from depression during September–November 1989. Her doctor prescribed Prozac. (R. 149, 150.)

She has been treated at a Salt Lake Community Health Center since October 1992. Her main treating physician there was Dr. Yong Hui Ahn. (R. 162–199, 206–226; *see* 107, 153–154.) Dr. Ahn recognized "a large component" of depression in this patient (R. 182). Dr. Ahn and her colleagues observed in their treatment notes that Mrs. Bird often appeared anxious or agitated (R. 164, 166, 182, 183), looked very sad or depressed (R. 166, 168, 189), was tearful (R. 165, 194), had dramatic mood changes (R. 174); had difficulty sleeping (R. 169, 187, & 216), was obsessive (R. 166), showed "poor coping" skills (R. 165), felt overwhelmed (R. 165), acted nervous or was "wringing her hands" (R. 168, 187), had "anxiety attacks" (R. 187), was "counseled regarding anxiety/panic behavior" (172), and requested refill of antidepressants (R. 208).

Dr. Ahn's diagnosis was "anxiety with depressive features." (R. 166 & 168.) She wrote "anxiety/depression" repeatedly in the treatment notes. (*E.g.* R. 163, 197.)

Dr. Curran, another physician at the Health Center, called Mrs. Bird's impairment "[c]hronic agitated depression." (R. 208.) And Dr. Milam similarly reported that Mrs. Bird was suffering from "agitated depression with acute exacerbation." (R. 217.) Treatment notes for September 20, 1994, indicated that "[m]ore than 50% of [the doctor's] time spent with this patient was in counseling." *Id.* Mrs. Bird was "suicidal in ideation but not in plan." *Id.* She had "trouble sleeping, exhibit[ed] anhedonia and decreased libido," and was "somewhat aloof and with a wall built around herself, not responding to comforting gestures very easily." *Id.*

The Health Center's "Problem List" for Mrs. Bird specifies "Anxiety/Depression" as a main concern. (R. 199, 206.) Valium and Xanax were prescribed.[4] (R. 160, 206, 217).

The doctors referred Mrs. Bird for counseling with a licensed clinical social worker at the Health Center, Mike Flowers. (R. 172.) Mr. Flowers noted that she had been "verbally fighting with neighbors," "talk[ed] about isolating herself ... from relatives as well," "impos[ed] a self created isolation on herself," was "[e]motionally out of control in almost every situation that demands reaction to stress," feared other people, and had low self-esteem. (R. 170 & 173.)

Mr. Flowers reported that Mrs. Bird suffered from a depressive syndrome and an anxiety-related disorder. (R. 233 & 234.) He opined that she had "Panic Disorder with Agrophobia [sic]":

> Her reaction to people is through panic, and her intent is to be perfect in carrying out instructions as she is afraid of any criticism ... The people she is afraid of include almost everyone from work place supervisors, to recognized authority figures, to neighbors and strangers. Most of the time she will stay indoors rather than go even into

---

**3.** She had a verbal scale IQ of 80, a performance scale IQ of 105, and a full scale IQ of 89. (R. 155.)

**4.** Valium and Xanax are both "indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety." *Physician's Desk Reference* 2526 & 2294 (52nd ed.1998).

her own back yard. She reports that a vacation for her is two weeks in bed rather than confront other people outside of her zone of security. If it were not for her husband and children she would probably try to disappear away from people as far as she could. She will awake several times at night in fear . . .

It is my impression that with appropriate attention she may eventually change and be able to work. . . .

(R. 229.)

In April 1994, Mrs. Bird was evaluated by a consulting psychologist, Dr. Louis F. Morse, who performed intelligence and memory testing, a mental status examination, and a clinical interview. (R. 155.) Dr. Morse reported:

Her mood today was fairly bright and upbeat although she became tearful at times when faced with test problems she could not solve. She said of her usual mood state, "I take Xanax for my nerves. I have mood swings. I worry a lot about my mom, the kids and the neighborhood we live in. I don't have energy and I get tired fast. I can't sleep and I don't feel like eating."

(R. 157). He found her motor behavior normal, and she was not suicidal. *Id.* Dr. Morse wrote, "She manifested a preoccupation with her worries, but signs of a more serious psychopathology were absent." (R. 158.) He concluded:

Her current mood state, as self-reported, qualifies her for the psychodiagnosis, Dysthymic Disorder.[5]

. . . She stated that she is able to perform ADL's [activities of daily living] without assistance.

She demonstrated good social skills in the interactions she had with me today. She said of her sociability, "I don't want to get close to people. They hurt you. I try to avoid people, but I'm lonely. I have only a few friends."

. . .

In her work on the tests today she demonstrated adequate concentration and persistence.

(R. 159).

In April 1994, Mrs. Bird was also examined by a consultative internist, Dr. Hubert C. Burton. He reported, "She . . . states that she's very anxious, but cannot define precisely why. . . . PHYSICAL EXAM: Reveals a very apprehensive female . . ." (R. 160.) His impression included "[c]hronic anxiety reaction." (R. 161.)

## VI. Discussion

### A. Standards for evaluating mental impairments

When there is evidence of a mental impairment that allegedly prevents a claimant from working, the Commissioner must follow the procedure set forth in 20 C.F.R. § 404.1520a and the listings in Appendix 1:

This procedure first requires the [Commissioner] to determine the presence or absence of "certain medical findings which have been found especially relevant to the ability to work," sometimes referred to as the "Part A" criteria. 20 C.F.R. § 404.1520a(b)(2). The [Commissioner] must then evaluate the degree of functional loss resulting from the impairment, using the "Part B" criteria. § 404.1520a(b)(3). To record [his] conclusions, the [Commissioner] then prepares a standard document called a Psychiatric Review Technique Form (PRT form) that tracks the listing requirements and evaluates the claimant under the Part A and B criteria. . . . At the ALJ hearing level, the regulations allow the ALJ to complete the PRT form with or without the assistance of a medical advisor and require the ALJ to attach the form to his or her written decision. *Id.*

*Cruse v. United States Dept. of Health & Human Servs.,* 49 F.3d 614, 617 (10th Cir.1995) (citing *Andrade v. Secretary of*

---

5. A "dysthymic disorder" is chronic but not of sufficient severity and duration to meet the criteria for a major depressive episode. *Mos-* *by's Medical, Nursing, & Allied Health Dictionary* 517 (4th ed.1994).

*Health & Human Servs.*, 985 F.2d 1045, 1048 (10th Cir.1993)).

### 1. "Part A" criteria

In this case, the ALJ completed the PRT form with the assistance of a medical advisor who reviewed Mrs. Bird's medical records and concluded that she had only a "dysthymic disorder." [6] (R. 117–123.) The medical advisor specified that she had no anxiety-related disorder (R. 121.)

Mr. Flowers also completed a PRT form. He indicated that Mrs. Bird had a depressive syndrome characterized by sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. (R. 230–233.) In addition, he indicated that she had an anxiety-related disorder evidenced by motor tension, apprehensive expectation, vigilance and scanning; a persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week. (R. 234.)

Mrs. Bird's attorney argues that the opinion of Mr. Flowers is "entitled to great deference," if not controlling weight, as the opinion of a treating source. (Memorandum in support of motion to reverse at 2.)

According to a regulation of the Commissioner's, medical opinions from "physicians and psychologists or other *acceptable medical sources* that reflect judgments about the nature and severity" of a claimant's impairment generally will be given more weight if they are from treating sources rather than consultative examinations. 20 C.F.R. § 416.927 (1999) (emphasis added). However, social workers are not included in the list of "acceptable medical sources." Section 416.913(a) (1999).

■ The ALJ correctly found that Mr. Flowers was "not an 'acceptable medical source' for purposes of establishing a diagnoses [sic]" under Part A. (R. 31.) [7]

■ But Mr. Flowers was not alone in diagnosing an affective or anxiety-related disorder. The more glaring issue is whether the ALJ erred in disregarding the opinions of Mrs. Bird's treating physicians who made similar diagnoses. An ALJ must give "controlling weight" to a treating physician's opinion about "the nature and severity of the claimant's impairments including the claimant's symptoms, diagnosis and prognosis, and any physical or mental restrictions" if that opinion is "well supported by clinical and laboratory diagnostic techniques and ... not inconsistent with other substantial evidence in the record." *Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir.1994).

■ Mrs. Bird's treating physicians, Dr. Ahn and her colleagues, diagnosed "anxiety with depressive features" and "agitated depression." (R. 166, 168, 208, 217.) Their diagnoses are supported by extensive treatment notes which document the following "Part A" criteria for a diagnosis of depressive syndrome or an anxiety-related disorder: anhedonia (R. 217), sleep

---

**6.** *See* n. 5.

**7.** The ALJ also rejected Mr. Flowers' diagnosis because an "assessment of agoraphobia is at odds with claimant's testimony at the hearing. She drives the kids to school, takes 30–60 minute walks in the neighborhood and she said she has no difficulty socializing." (R. 31.)

Mr. Flowers indicated that Mrs. Bird avoided going into the backyard to meet with neighbors. (R. 229.) At the administrative hearing, she was asked, "How often do you get out of the house socially to visit with friends? Neighbors? Family?" She answered, "About three times a week." (R. 269.) Later she was asked, "Who do you visit?" She said, "My mother and my sisters and some older people in the backyard." (R. 274.) She explained that the visit would last only half an hour. *Id.* She also testified that she liked being around other people. (R. 265.)

Thus, some of her testimony casts doubt on a diagnosis of agoraphobia.

disturbance (R. 169, 187, 216), decreased energy (R. 168, 217), thoughts of suicide (R. 217), and recurrent severe panic attacks (R. 172, 187).[8]

In these circumstances, the ALJ was not supported by substantial evidence in concluding there was no medical evidence of a depressive syndrome or anxiety-related disorder.

### 2. *"Part B" criteria*

To meet the "Part B" criteria of the listings for affective disorders (¶ 12.04) or anxiety-related disorders (¶ 12.06), Mrs. Bird needed to show at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Frequent deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation (decompensation) or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. § 404.1520a(b)(3).

On his PRT form, the medical advisor rated the severity of Mrs. Bird's impairment as follows. Restriction of activities of daily living was "slight." Difficulties in maintaining social functioning were "moderate." Deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner occurred "often." He said there was "insufficient

evidence" of any episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw or to experience exacerbation of signs and symptoms. (R. 124.)

In other words, the medical advisor found that none of the "Part B" criteria were met.

The findings on the PRT form which the ALJ signed and attached to his decision correspond to the medical advisor's findings, except the ALJ indicated that Mrs. Bird "never" experienced episodes of deterioration or decompensation. (R. 36–38.)

A treating physician, Dr. Milam, reported an apparent episode of deterioration or decompensation in his treatment notes for September 20, 1994, (R. 217.)

 Mr. Flowers rated the severity of her impairment as follows. Restriction of activities of daily living was "marked." Difficulties in maintaining social functioning were "marked." Deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner were "constant." Episodes of deterioration or decompensation were not rated. (R. 237.)

In other words, Mr. Flowers found that three of the four "Part B" criteria were met. (Only two of the four were necessary to satisfy the listings.)

Mr. Flowers had been treating Mrs. Bird for more than a year when he made his assessment. (R. 173 & 229.)

Although Mr. Flower's assessment is not entitled to "controlling" weight because it does not come from an "acceptable medical source," it is relevant evidence of the "Part

---

8. In a written questionnaire, Mrs. Bird was asked to describe where she generally goes when she leaves home, how often she goes, and how much time she spends visiting with family and friends. She wrote:

Once [in] awhile I'll take & walk Kid[s] to park & Let Them play About 1 hour. I'll go see my Husband['s] sister & Fiamaly [sic] about 2 times a month. Once a week I go to Store & get thing[s] I need. I walk Kids to School.... (R. 106).

Mrs. Bird indicated that she participated in no social, sports or other groups. *Id.* She said she has ongoing therapy for depression. She testified that she cries a lot, worries a lot, doesn't eat much, and sometimes gets "real nervous." (R. 265.) She said she doesn't "trust very many people anymore." (R. 273.)

On the whole, her testimony is not inconsistent with a diagnosis of anxiety and depression.

B" criteria. *See* 20 C.F.R. § 416.913(e) (information from social workers may help the Commissioner understand how a claimant's impairment affects her ability to work).

The ALJ gave two additional reasons for rejecting Mr. Flower's opinion:

Mr. Flower's report conflicts with the psychological evaluation in the record ... [T]his report is way out in left field. It also does not coincide with Dr. Hubert C. Burton's assessment ...

(R. 31).

Dr. Morse, the consulting psychologist, observed some symptoms of anxiety and depression but, unlike Mr. Flowers, concluded Mrs. Bird had no "serious psychopathology." (R. 158.) On the other hand, Dr. Burton's observation that she was very apprehensive and his impression that she has a "chronic anxiety reaction" are consistent with Mr. Flowers' opinion. (R. 161.)

Thus, the only medical evidence of record that necessarily contradicts Mr. Flowers' assessment of the severity of Mrs. Bird's impairment, and supports the ALJ's assessment, is Dr. Morse's opinion after his consultative psychological evaluation.

The court agrees this is not substantial evidence in view of the record as a whole.

## VII. Conclusion

"Obviously, the record must contain substantial competent evidence to support the conclusions recorded on the PRT form." *Cruse*, 49 F.3d at 617.

In *Cruse*, the ALJ "repeated the conclusions indicated on the PRT form, but only generally discussed the evidence of [the claimant's] mental impairment" and "did not relate that evidence to his conclusions" on the PRT form. 49 F.3d at 618. The Tenth Circuit remanded the case to the Secretary for further consideration of the claimant's mental impairment.

Here, the ALJ's decision does not even mention the reports and diagnoses of any of Mrs. Bird's treating physicians regarding her mental impairment. That error tainted the ALJ's conclusions on his PRT form and his subsequent findings, including his finding that Mrs. Bird had only one nonexertional limitation (an inability to follow complex instructions because of her diminished memory and intelligence).

The court will therefore remand the case with instructions for the ALJ to: (1) consider and discuss the opinions, treatment notes, and other medical evidence of anxiety and depression submitted by Mrs. Bird's treating physicians; (2) relate that medical evidence to conclusions on the PRT form; and (3) complete a new PRT form. The court recommends that the ALJ elicit further evidence from the treating physician's regarding the "Part B" criteria of the listings.

If the ALJ again concludes that the listings for anxiety or depression are not met, he should complete the sequential evaluation, considering the extent of Mrs. Bird's nonexertional limitations and posing to the vocational specialist a hypothetical which takes all of those limitations into account.

Certainly "[a] finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time." *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir.1994) (quoting *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir.1986)).

## VIII. Order

IT IS THEREFORE ORDERED that the plaintiff's motion to reverse or remand the administrative decision is granted; the Commissioner's motion to affirm is denied.

The case is hereby remanded to the Commissioner for further proceedings consistent with the court's decision.