**Rachel A. BLACK, Plaintiff,**

v.

**Jo Anne B. BARNHART[1], Commissioner of Social Security, Defendant.**

**No. 4–01–CV–90574.**

United States District Court, S.D. Iowa, Central Division.

Dec. 24, 2002.

---

**1.** Jo Anne B. Barnhart became the Commissioner of Social Security on November 9, 2001. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure [Rule 43(c)(2) of the Federal Rules of Appellate Procedure], Jo Anne B. Barnhart should be substituted, therefore, for Acting Commissioner Larry G. Massanari as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Thomas A. Krause, Schott Law Firm, Des Moines, IA, for Plaintiff.

Christopher D. Hagen, United States Attorney, Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

Plaintiff, Rachel A. Black, filed a Complaint in this Court on September 27, 2001, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

## BACKGROUND

Plaintiff filed applications for Social Security Disability Benefits on October 6, 1998. Tr. at 124–26 and 452–54. When Plaintiff made her applications, she stated that she became unable to work on October 1, 1995. Tr. at 124. At the hearing, however, Plaintiff amended her onset of disability date to June 1, 1996. Tr. at 103. Plaintiff had filed prior applications for benefits which the ALJ declined to reopen and the Court is without jurisdiction to review that part of the decision. *Califano v. Sanders,* 430 U.S. 99, 107–08, 97 S.Ct. 980, 985–86, 51 L.Ed.2d 192 (1977).

After the applications were denied initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge John P. Johnson (ALJ) on March 30, 2000. Tr. at 52–104. The ALJ issued a Notice of Decision—Unfavorable on June 8, 2000. Tr. at 9–27. The ALJ's Decision was affirmed by the Appeals Council of the Social Security Administration on August 1, 2001. A Complaint was filed in this Court on September 27, 2001.

## MEDICAL EVIDENCE

The Court has read each page of this voluminous medical record. Tr. at 247–451. Most of the pages are copies of individual treatment sessions from Plaintiff's psychiatrists and therapists. No useful purpose will be served by attempting to summarize each of those treatment records. Rather, the Court will summarize Plaintiff's impairments and limitations as

recited by the mental health providers and refer only to those portions of the record material to this discussion. The Court wishes to emphasize again, however, that the entire record was reviewed.

On September 13, 1996, Plaintiff, then 20 years old, was seen by psychiatrist Gary Gronstedt, D.O. Although Plaintiff sought treatment for depression, she reported that she had manic episodes in the past, the last one being in March of 1996. Plaintiff had been hospitalized on three occasions at ages 14 and 15 for oppositional defiant behavior, borderline personality disorder and depression. Plaintiff had also spent one year living at an inpatient facility—Orchard Place. On mental status exam, Plaintiff appeared to be depressed with a constricted range of affect. Tr. at 256. Dr. Gronstedt's diagnosis on Axis I was major depression disorder, recurrent, severe, without psychotic features. On Axis II the diagnosis was borderline personality traits. Plaintiff's global assessment of functioning was rated at 40. In addition to prescribing medication, the doctor arranged for Plaintiff to be seen by therapist Kathy Koenig. Tr. at 257. When he saw Plaintiff on October 28, 1996, the doctor made an Axis II diagnosis of borderline personality disorder. Tr. at 252.

An Orchard Place report dated October 4, 1993, states that Plaintiff had been admitted to Kenyon House Inpatient Treatment Unit on April 21, 1992, and received in home family centered services from March 19 to October 1, 1993. Tr. at 279.

Plaintiff was treated at Child Psychiatry Associates from December 9, 1993 through November 18, 1998. Tr. at 288–94.

Kathryn Koenig, MS, NCC, LMHC, LMSW wrote to the Social Security Administration on November 23, 1998. Ms. Koenig said that Plaintiff had a significant decrease in her ability to function. She said that a persistent pattern of mood dysfunction continued to be a problem. Although there had been brief periods of time when Plaintiff was able to work on a part time basis, it was Ms. Koenig's opinion that Plaintiff would never be able to work a full time job on a consistent basis. Tr. at 315.

On April 19, 1999, Dr. Gronstedt wrote to Disability Determination Services in support of Plaintiff's application for benefits. The doctor wrote that during the time he had been treating her for depression he has observed "ongoing episodes of not being able to function..." The doctor wrote that even when Plaintiff's symptoms subside, the reoccur after a short time. He wrote:

> Most significantly, her symptoms include being depressed with anergia, anhedonia, and lack of motivation. She also has had episodes of psychotic symptoms. At this point, they are stable. She is not able to function in her daily activities secondary to her depression. She recently returned back home after being in Utah, and since that time she has been decompensating with hypersomnolence, decrease in motivation, having difficulty performing her daily activities.

Tr. at 297. In a letter dated April 26, 1999, Dr. Gronstedt wrote that Plaintiff's medication caused "parkinson's like" side effects. Tr. at 296.

Herbert L. Notch, Ph.D., a consultant for Disability Determination Services, filled out a psychiatric review technique form (PRTF) on January 3, 1999. Tr. at 356–66. Dr. Notch opined that as a result of an Affective disorder (Tr. at 356), Plaintiff had moderate restriction of activities of daily living, moderate difficulties maintaining social functioning, and that she often had deficiencies of concentration, persistence or pace resulting in failures to complete tasks in a timely manner. Tr. at 363.

Dr. Notch also filled out a mental residual functional capacity assessment form. Tr. at 367–70. He found that Plaintiff was moderately limited in the following domains: The ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and, the ability to respond appropriately to changes in the work setting. Tr. at 368. On May 2, 1999, John F. Tedesco, Ph.D., another DDS consultant, filled out a PRTF. Although Dr. Tedesco found that Plaintiff had a personality disorder as well as an affective disorder, and that these were severe impairments (Tr. at 371), he did not fill out part b of the form on which the functional restrictions are noted. Tr. at 378. Dr. Tedesco did, however, complete a mental residual functional capacity form on which he found that Plaintiff was moderately limited in her ability to: understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods (Tr. at 380); to complete a normal workday etc.; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting. Tr. at 381.

Ms. Koenig wrote a letter on March 22, 2000. Tr. at 405–07. Ms Koenig wrote that the current diagnosis was bipolar disorder, most recent episode depressed, mild. She continued: "Rachel has maintained her current level of functioning for the last 3–4 months. During this past year, she has also had increased difficulties with thought disorder, difficulty with medications and functional changes due to medication shifts." Ms. Koenig wrote that Plaintiff had moderate to severe amount of difficulty maintaining any level of functioning in a work or school environment in the previous 2–3 years. When Plaintiff appears to be doing well, it is often a symptom of a manic episode which Plaintiff is only able to sustain for "a very brief period of time." Tr. at 405. Ms. Koenig wrote that at least one of Plaintiff's part time jobs was less successful than she had been led to believe. She said that Plaintiff's irritability and lack of social skills made it difficult for her to follow directions and respond to supervisors and co-workers. Ms. Koenig stated that because Plaintiff had been living with her parents in a supportive family environment, she appeared to be doing better than would be the case if she were on her own. "I would suspect that she would have had more failed events and perhaps even more hospitalizations." She also wrote: "I think that the stress of full time [employment] for someone with Rachel's diagnosis and behavioral issues is a setup for failure." Tr. at 406. Ms. Koenig wrote that Plaintiff had been very compliant with medications in spite of "very difficult side effects." "She has been unable to sustain any type of educational or job functioning for any period of time." Ms. Koenig concluded her report:

> If I can offer any further information with regard to Rachel's case, I would be more than happy to do so. I strongly support her application for social security disability. I think that she is not likely to succeed in the normal work environment as one might hope. I think that even with constant encouragement

by myself, her physician, her family, etc., she has not been able to initiate, maintain or sustain any type of activity in the education or work realm for any length of time. The past several months have found that in spite of a lot of support and encouragements, she's not been able to make any progress.

Tr. at 407. Along with the report, Ms. Koenig submitted a Medical Assessment Of Ability To Do Work–Related Mental Activities. On this form, the term "fair" is defined as the ability to function in this area is seriously limited, but not precluded. Items marked as "fair" are the ability: to follow work rules; relate to co-workers; deal with the public; deal with work stresses; maintain attention/concentration (Tr. at 408); understand, remember, and carry out complex job instructions; maintain personal appearance; behave in an emotionally stable manner; relate predictably in social situations; and, demonstrate reliability. Tr. at 409.

Leonard S. Richards, D.O. wrote a report on March 28, 2000. He said that had been seeing Plaintiff since May of 1999 after he took over the case from Dr. Gronstedt. The doctor said that Plaintiff was taking Prozac, Depakote and the antipsychotic Risperdal. He said that medications Plaintiff had taken in the past were either unsuccessful or had caused significant cognitive and physical side effects. He said that prognosis for significant improvement was unlikely. Because Ms. Koenig had been working with Plaintiff for an extended period of time, the doctor opined that she was in a better position to comment on Plaintiff's limitations and that he would concur with her observations. Tr. at 451.

### ADMINISTRATIVE HEARING

Plaintiff, with counsel, appeared and testified at an administrative hearing on March 30, 2000. Tr. at 52–104. Plaintiff testified that she was 23 years old, five feet, seven inches tall and that she weighed 200 pounds. Tr. at 56. She said that weight gain was a side effect of her medication. Plaintiff said she finished the 10th grade and later obtained a GED. Tr. at 57.

Plaintiff testified that from March to July of 1998, she had worked at a book store 25 hours a week and that she earned $6.00 per hour. Tr. at 58. At the book store, Plaintiff worked as a cashier and at the information desk. Sometimes she would shelve books. Plaintiff also worked at the book store from November 1996 to April, 1997. Tr. at 59. Plaintiff said that while she was working, there were times she would miss work for "a few days" because of her illness. Tr. at 60. Plaintiff said that although she quit working at the book store to go to Utah, she was having problems at work at that time, and that when she later reapplied, she was not hired. Before working at the book store, Plaintiff had worked as a waitress from January to June of 1996. Tr. at 61. Plaintiff testified that on one of her past jobs, she had been fired because her depression was interfering with her ability to do her work. Tr. at 64. Plaintiff said that in her past jobs she often missed more than a day's work each week because of her illness. Tr. at 65.

Plaintiff was asked to explain her illness. She said that she was bipolar. "Part of the time, I'm really, really happy and really, really, excited. That only lasts a little bit and then I'm, I get really, really depressed and I can't function and it's really hard to just deal with basic things. I also have a thought disorder, ... I can't concentrate on a lot of things and thinking becomes hard sometimes." Plaintiff said that she was having fewer manic episodes and more frequent depressive ones. Tr. at 70. Plaintiff said that the cycling of her manic/depressive episodes was "a lot of

[the] reasons for me quitting or missing work." Plaintiff's said that she went to Utah to begin taking college classes. "That was my goal, but I never quite made it." Tr. at 71. Plaintiff said that she had signed up for the independent study course, but that she was never able to turn in the first assignment so she wasted her money. Tr. at 72. When Plaintiff was asked about her ability to complete tasks, she replied: "Well, if they seem too hard or, or I don't understand them, I basically, just give up or try to get the easy way out or even, . . . in a situation like at Borders (the book store), other people would end up doing it for me." Tr. at 76.

Plaintiff said that her daily activities consist of helping her mother if she's having a good day. "If it's a bad day, I, sometimes, I just sit in the chair and sometimes, I just go, even go back to bed." Tr. at 79. Plaintiff said that in the previous year she had gone out of town to visit a friend and to visit her brother. Tr. at 82. She was asked why she could not work if she can travel, to which she responded: "Well, while traveling, I would still have bad days, but since it was friends and people I knew, I could just, crash on their beds and I could take time off I needed and working is, has a lot more involved to it. . . I think there's a difference." Tr. at 82–83. Plaintiff said that when she went to help her sister take care of a new baby, "I helped her as long as I could, but then, I started feeling poorly and she said, it's time for you to go home." Tr. at 83. After Plaintiff testified, her mother was called as a witness. Tr. at 91. Plaintiff's mother said that when Plaintiff was working at the book store she would often come home and "say that everybody hated her at work." She said that it made it difficult for her daughter to go to work because she felt that nobody liked her. Tr. at 92. On a bad day, Plaintiff "doesn't want to get out of bed at all and just basic function is difficult for her. She doesn't want to take a shower. She doesn't want to do any of those things that she just would normally do in the day. She just wants to spend the time in bed and be away from people and she usually tells me that she doesn't feel well and doesn't know why she doesn't feel well." Tr. at 93.

Next, the ALJ called Jeff L. Johnson to testify as a vocational expert. Tr. at 96. The ALJ asked the following hypothetical question:

> . . . we have an individual who is 23 years old, she was 19 years old as of the alleged onset date of disability, she's a female, she has a high school general equivalency diploma, and past relevant work as a cashier 2, shelver, and waitress and she has the following impairments; she has a bipolar affective disorder, history of recurrent major depressive disorder, and borderline personality disorder and as a result of a combination of those impairments, she has—and medication or other treatment prescribed for those impairments, she has the residual functional capacity as follows; she is not able to do very complex or technical work, but is able to do more than simple, routine, repetitive work, which does not require constant attention to detail, she should have no more than occasional contact with the public, she does require occasional supervision, she should not work at more than a regular pace and that's using three speeds of pace, being fast, regular, and slow, and she should not work at more than a mild to moderate level of stress. Would this individual be able to perform any job she previously worked at, either as she performed it or as it is generally performed within the national economy?

Tr. at 99. In response, the vocational expert testified that Plaintiff's past work would be precluded due to the restriction

on contact with the public, although the shelver portion of the book store job could be done. Tr. at 99–100. Plaintiff had not acquired skills that would transfer to other jobs, but the vocational expert testified that the hypothetical would allow for unskilled jobs such as laundry worker 2, production assembler, and surveillance monitor. Tr. at 100.

The ALJ asked the vocational expert to consider a person who would be limited to simple, routine, repetitive work, which does not require close attention to detail, requires occasional supervision, not able to work at more than a regular pace and a mild level of stress. The vocational expert responded as he did to the first hypothetical that the shelver portion of the book store job could be done, and that the unskilled work cited above could be done. Tr. at 101. The vocational expert testified that if a person has more than three days of absence from work each month, no work would be allowed.

Plaintiff's lawyer asked the vocational expert to add to the ALJ's hypothetical the limitation that the hypothetical person often had deficiencies of concentration, persistence and pace resulting in failure to complete tasks in a timely manner. The vocational expert said that none of Plaintiff's past work could be done. Tr. at 102. He also said that no other work would be possible. Tr. at 103.

## ALJ'S DECISION

In his decision, the ALJ noted that Plaintiff last met the insured status requirements of the Social Security Act on March 31, 2000. Following the familiar five step sequential evaluation, the ALJ found that Plaintiff had engaged in substantial gainful activity from January 1997 through April 1997, and again from March 1998 through July 1998 The ALJ found, at the second step, that Plaintiff's severe impairments are bipolar affective disorder, recurrent major depressive disorder, and personalty disorder, but that the impairments do not meet or equal one listed in Appendix 1, Subpart P, Regulations No. 4. Tr. at 18. At the fourth step, the ALJ found that Plaintiff is able to do her past work as a shelver. In that regard the ALJ found that Plaintiff has a residual functional capacity consistent with his first hypothetical. Tr. at 18. It was the decision of the ALJ that Plaintiff is not disabled nor entitled to the benefits for which she applied.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater*, 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan*, 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel*, 149 F.3d 907, 910–11 (8th Cir.1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134,

1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir.1975).

Pursuant to the Social Security Act, the SSA follows a sequential evaluation process in determining disability. *See* 20 C.F.R. §§ 404.1520 and 416.920. During the five-step process, the ALJ considers whether (1) the claimant is gainfully employed, (2) the claimant has a severe impairment, (3) the impairment meets the criteria of any of those listed in Appendix 1, to Subpart P of Part 404 (the listings), (4) the impairment prevents the claimant from performing past relevant work, and (5) the impairment necessarily prevents the claimant from doing any other work. *Id.* If a claimant fails to meet the criteria at any step, other than step 3, in the evaluation of disability, the process ends and the claimant is determined to be not disabled. If the claimant meets the criteria of the listings, at step 3, he or she is determined to be disabled. *Id. See Ramirez v. Barnhart*, 292 F.3d 576, 580 (8th Cir.2002) (discussing the sequential evaluation).

In the case at bar, the ALJ found that Plaintiff had engaged in substantial gainful activity from January through April 1997, and from March through July 1998. It had previously been determined, however, that the work during those months was not Substantial gainful activity. On November 13, 1997, a claims representative of the Social Security Administration wrote: "She has worked enough to become insured for T 2, but no work has represented SGA. All jobs were 3 months or less and stopped because of health until her last job 11/96—4/97, but she only worked part-time. Average earnings would be $460.00 to 550.00 With $40—$50 IRWES[2] each month. Please use prior onset 2/93." Tr. at 138. The transcript of this case also has a detailed earnings record. Tr. at 132. The ALJ stated that in 1996, Plaintiff earned $5,982. Tr. at 13. The earnings record, however, shows that these earnings were from three different jobs. Plaintiff explained in her testimony that the jobs were of short duration and that there were gaps between them because of her illness. Tr. at 66. As noted above, Plaintiff amended her onset of disability date to June 1, 1996 and work thereafter was part time with work related expenses bringing it below substantial gainful activity levels. On remand for computation and payment of benefits, if it is determined that Plaintiff's work after the amended onset date of June 1, 1996, did in fact amount to more than an unsuccessful work attempt, it will only affect the number of months for which she is eligible to collect benefits, because as will be shown below, it was the testimony of the vocational expert that when her true residual functional capacity is considered, Plaintiff is unable to work in competitive employment.

■ The ALJ found, at the fourth step of the sequential evaluation that Plaintiff is able to do her past work as a shelver at the book store. This finding, however, is erroneous for, possibly, two reasons. First, Plaintiff's work at the book store may not have been substantial gainful activity when the impairment related expenses are deducted from her earnings. *See, e.g. Vincent v. Apfel*, 264 F.3d 767, 769 (8th Cir.2001), in which Court, citing 20 C.F.R. § 416.965(a), wrote that to be considered past relevant work, a job must have been done within the last 15 years, been done long enough to learn to do it and have been substantial gainful activity. If it is again determined that the job at the book store was not substantial gainful activity, it will not be a part of her past relevant work. Even if the job was part of the past relevant work, however, it was still error to stop the sequential evaluation

2. Impairment Related Work Expenses.

at the fourth step, given the testimony of the vocational expert.

In *Gavin v. Heckler,* 811 F.2d 1195, 1201 (8th Cir.1987), the Court wrote:

> Ordinarily, where the Secretary has incorrectly allocated the burden of proof based upon an erroneous finding that the claimant can return to his prior work, we will remand for further proceedings. However, where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand.

■ In the case at bar, when the vocational expert was asked if Plaintiff would be able to work if she often had deficiencies of concentration, persistence, and pace resulting in failure to complete tasks in a timely manner, it was his testimony that no work would be possible. The ALJ wrote that he rejected the opinion of Plaintiff's treating physician and therapist in favor of the psychologist who reviewed the record. Again and again, the Court of Appeals has stated that the opinion of a consulting physician who does not examine the claimant, or who examines the claimant once, is not substantial evidence upon which to base a denial of disability, especially if the consultant's opinion is contradicted by that of the treating physician. *See, e.g. Lauer v. Apfel,* 245 F.3d 700, 705 (8th Cir.2001) citing *Onstead v. Sullivan,* 962 F.2d 803, 805 (8th Cir.1992). In this case, however, not only did the treating physician opine that Plaintiff would often be unable to complete tasks in a timely manner because of deficiencies of concentration persistence or pace, the very psychologist upon whom the ALJ chose to rely, came to the same conclusion. Although Dr. Tedesco did not complete part b of the PRTF, he did agree with Dr. Notch, the other DDS consultant, that Plaintiff would be moderately limited in her ability to complete work-days and work-weeks, a limitation that the vocational expert said would eliminate competitive employment. As the Court wrote in *Rhines v. Harris,* 634 F.2d 1076, 1079 (8th Cir.1980): "The Secretary need not find a specific job for a claimant. However, it must be shown that claimant can realistically perform in existing employment."

The fact that Plaintiff may have had symptom free periods of time does not prove the ability to work on a sustained basis. In *Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir.2001), the Court wrote:

> With regard to mental disorders, the Commissioner's decision "must take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes." *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir.1984). Given the unpredictable course of mental illness, "[s]ymptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse." *Andler v. Chater,* 100 F.3d 1389, 1393 (8th Cir. 1996). Moreover, "[i]ndividuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E)(1999). "Such individual may be much more impaired for work than their signs and symptoms would indicate." *Id.*

■ Such is the situation in the case at bar. When Plaintiff's illness is in a manic phase, she wants to work, and may be able to do so. The manic phase of Plaintiff's illness, however only lasts for a short period of time after which Plaintiff returns to the depressive phase. Also, during periods when Plaintiff is in highly supportive environments surrounded by her family

and close friends, she may appear to function normally. Even here, however, initial appearances, are deceptive. She testified, as did her mother, that there are many days when her depression prevents her from getting out of bed. Her doctors testified, through the reports, that the medication, while effective, has significant side effects which affect Plaintiff's ability to think and to function physically. The Court would note that Plaintiff has never been able to hold a job for more than short periods of time. Even when Plaintiff attempted to go to school where she was permitted to study independently, her illness interfered and prevented success. In *Tennant v. Schweiker*, 682 F.2d 707, 710 (8th Cir.1982), the Court wrote: "The most compelling evidence relates to Tennant's work history. Tennant has held *forty-six* jobs in his twelve years of employment. His longest tenure at any job was six months. It appears that he has been fired from most of these jobs." (Emphasis in original). Although the record may not have established that Plaintiff attempted to work as often as the claimant in *Tennant*, the record clearly establishes that Plaintiff has never been successful in any attempt at work or school. As in *Tennant*, the record of this case has been fully developed and the overwhelming weight of the evidence supports Plaintiff's claim. A remand to take additional evidence, therefore, will serve no purpose and a reversal is the appropriate remedy. *Id.*

This case brings to mind the case of *Pagan v. Bowen*, 862 F.2d 340 (D.C.Cir. 1988). In *Pagan*, the claimant suffered from schizophrenia. During periods when Pagan was not suffering from severe symptoms, her illness was ameliorated by medication and she exhibited symptoms of a lesser magnitude. During such times, she was described in treatment records as alert and well oriented, and she demonstrated an ability to function, to a limited degree, in daily life. During such periods she performed household chores, shopped, rode on public transit, sewed, read for pleasure and played cards. Additionally, however, there was evidence which indicated that her medication caused drowsiness and decreased psychomotor activity as well as an inability to concentrate. Her physician said that she was at significant risk of relapse which could be triggered by stress or anxiety. *Id.* at 345. Chief Judge Wald wrote:

> The Secretary contends that "the law is clear" that a claimant is not disabled if his or her mental impairment can be reasonably controlled by medication and treatment. Appellee's Br. 30–31. But as we discuss below, it is not quite that simple. Moreover, although this proposition is said to be supported by *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986), *Gross* involved the control of stomach ulcers, arthritis and poor vision. *Id.* at 1165–66. The courts and even the Secretary's own regulations recognize the inapplicability of such precedents to schizophrenia cases. *See Poulin*, 817 F.2d at 875 ("the normal course of mental illness distinguishes it from broken bones"); *Singletary*, 798 F.2d at 821; *Lebus*, 526 F.Supp. at 61 ("While the mere existence of symptom-free periods may negate a finding of disability when a physical ailment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of the claim."); Listing of Impairments § 12.03 C (mental impairment can persist despite "attenuat[ion] by medication").
>
> *More fundamentally*, we emphasize that we do not of course hold that a claimant can obtain benefits even if there are *no* symptoms between severe episodes, however far apart, nor do we hold that the existence of *any* symptoms, no matter how slight, is sufficient to warrant a finding of disability.... Whether an in-

dividual remains impaired during remission periods depends on the particular circumstances, including the length of time spent in remission, the severity of the remission-period symptoms and the likelihood, frequency and severity of relapses into severe psychotic behavior. *See Poulin,* 817 F.2d at 876; Listing of Impairments § 12.00 D; *see also Lebus,* 526 F.Supp. At 61 (at some point in time "a disorder may be presumed to have sufficiently abated so that it is no longer disabling").

As stated above, the evidence in this case is clear that Plaintiff suffers from a chronic mental illness, namely bipolar disorder. According to her doctors who are the experts on the subject (*see Wilder v. Chater,* 64 F.3d 335, 337–338 (7th Cir.1995) (mental health professionals are the experts on mental illness)), Plaintiff is not able to work on a consistent basis and the vocational expert testified that when her limitations are considered there is no competitive work that she can do. Plaintiff qualifies for the benefits for which she applied.

## CONCLUSION AND DECISION

The Court holds that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D. Ark. 1987). Therefore, reversal with an award of benefits is the appropriate remedy. *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir.1984).

Defendant's motion to affirm the Commissioner is denied. **This cause is remanded to the Commissioner for computation and payment of Title II and Title XVI benefits.** The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See Shalala v. Schaefer,* 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993) and LR 54.2(b).

IT IS SO ORDERED.