Diane **WALLACE**, Plaintiff,

v.

**Jo Anne B. BARNHART, Commissioner of Social Security Defendant.**

**No. 016471CIVJORDAN.**

United States District Court, S.D. Florida.

April 7, 2003.

Christina M. Carrano, Binder & Binder, P.A., Fort Lauderdale, FL, for Plaintiffs.

Laura Bonn, AUSA, United States Attorney's Office, Miami, FL, for Defendants.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

BROWN, United States Magistrate Judge.

**THIS MATTER** is before the Court on Plaintiff's Motion for Summary Judgment, filed February 20, 2002, and on Defendant's Motion for Summary Judgment, filed March 4, 2002. The Court has reviewed the Motions and all pertinent portions of the file.

### PROCEDURAL HISTORY

Plaintiff, Diane Wallace, filed her application for disability insurance benefits on September 6, 1996 for a period of disability commencing December 9, 1994. T. 104–112. Plaintiff's application, which was based on spinal injuries, back pain, post-traumatic stress disorder and depression resulting from a domestic assault, was denied initially and again on reconsideration. T. 108. Consequently, Plaintiff requested

an administrative hearing. T. 40. An administrative hearing was held before an Administrative Law Judge (the "ALJ") on October 15, 1997, where Plaintiff appeared with counsel. T. 42–64. On December 17, 1997, the ALJ rendered his decision denying Plaintiff's claim. T. 149–162. Subsequently, Plaintiff requested that the Appeals Council of the Social Security Administration (the "Appeals Council") review the ALJ's decision. T. 166–168. On December 17, 1998, the Appeals Council issued an order vacating the ALJ's decision and remanding the case for further proceedings. T. 171–172.

On remand, Plaintiff and a vocational expert testified before the ALJ at a supplemental hearing. T. 65–89. At the supplemental hearing, it was established that the disability determination would be subject to a closed period beginning December 9, 1994 and lasting until September 1, 1997. T. 68. On June 26, 1999, the ALJ issued an order denying Plaintiff's claim and the Appeals Council subsequently denied Plaintiff's request for review. T. 6–7, 17–25. Thus, the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration (the "Commissioner").

### FACTS

### I. Medical Evidence Submitted to the ALJ

The medical evidence submitted to the ALJ indicates that on December 9, 1994, Plaintiff, age 42, was assaulted by her live-in boyfriend. T. 207. Three days later, Plaintiff was taken to a hospital emergency room with bruises to the upper body and lower extremities, head pain, and tingling in both lower extremities. T. 207. Hospital records indicate that Plaintiff suffered a coccyx fracture, a liver contusion, cervicalgia, a lumbar sprain, and a hip contusion. T. 206. Plaintiff was released from the hospital on the following day and was

instructed to follow-up with her gynecologist for a pelvic exam and with her private physician for injuries including multiple contusions, coccyx sprain/fracture, transaminitis, and possible hypertension secondary to stress. T. 196. She was also advised to seek counseling. T. 196.

### A. Physical Examinations

Subsequent to her initial hospitalization described above, Plaintiff underwent two neurological examinations, one in February 1995 and one in April 1995. T. 249–253, 327–331. Plaintiff complained that since her assault, she had experienced low back pain and abnormal sensations, muscle spasms, and weakness in both her legs. T. 327. The neurologist concluded that there was clinical and electromyographic evidence of a left lumbosacral radiculopathy affecting predominately the L5 nerve root, which was associated with motor axon degeneration. T.253. The neurologist recommended that Plaintiff avoid any activities that exacerbated her pain, which included sitting for prolonged periods of time or lifting heavy objects, and continue moderate use of nonsteroidal anti-inflammatory drugs for pain as well as for anti-inflammatory management. T. 253.

From October 1995 to April 1996, Plaintiff was treated by an orthopedic surgeon (the "surgeon"). T. 182–195. Plaintiff complained of low back pain with radiculopathy to her lower left leg. T. 193. After his initial examination of Plaintiff, the surgeon prescribed medication and recommended physical therapy. T. 193. A subsequent MRI demonstrated that Plaintiff had a bulging disc at L4–L5, with no evidence of disc herniation. T. 192. According to the surgeon, Plaintiff clinically had a herniated disc with lumbar radiculopathy. T. 192. In later appointments with the surgeon, Plaintiff reported that her symptoms persisted and worsened. T. 186, 188,

190–191. The surgeon referred Plaintiff to a pain management specialist, who performed a series of lumbar epidural blocks. T. 341–351. In the event that the epidural blocks did not relieve Plaintiff's symptoms, the surgeon concluded that he would refer her to a neurosurgeon for a probable myelogram, CAT scan, and possible surgery. T. 186.

At the request of Plaintiff's long-term disability carrier, the surgeon completed a Statement of Functional Capacity Form in November 1995, wherein he reported that Plaintiff was unimproved and was totally disabled from her occupation and from any other occupation. T. 336–337. In his last examination of Plaintiff in April 1996, the surgeon noted that a repeat MRI of the lumbosacral spine demonstrated desiccation of the L4–L5 disc, with no evidence of disc herniation. T. 183. He opined that Plaintiff had reached maximum medical improvement and was to discontinue physical therapy and was to follow up with him on an as needed basis. T. 183. He also noted in his final narrative report that Plaintiff had a permanent partial disability of ten percent of her body as a whole. T. 195.

In September 1996, Plaintiff was evaluated by a physician in conjunction with a civil lawsuit filed on her behalf. T. 360–365. The physician's diagnoses of Plaintiff were: status post-probable nondisplaced fracture of the coccyx with coccydynia; traumatic lumbosacral myofascitis with derangement and left radiculopathy with L4–L5 symptomatic bulge; traumatic functional anxiety reaction; and traumatic pelvic periostitis with ligamentitis. T. 364. He opined that Plaintiff should continue (physical) therapy, should perform lumbosacral exercises, utilize a lumbosacral corset, take appropriate medication, have physiotherapy, and continue treatment with her physicians. T. 364. He also stated that Plaintiff should continue to receive psychological treatment because of her anxiety problems. T. 364.

In connection with Plaintiff's initial application, a medical consultant with the Office of Disability Determinations prepared a Residual Physical Functional Capacity Assessment ("RPFCA") in October 1996. T. 288–295. The physician opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, stand and/or walk for a total of about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and was unlimited in her ability to push and/or pull. T. 289. The physician also opined that Plaintiff would occasionally be limited in her ability to climb, balance, stoop, kneel, crouch, or crawl. T. 290. The physician found that Plaintiff did not have any manipulative limitations, visual limitations, or communicative limitations. T. 291–292. Finally, the physician opined that Plaintiff must avoid concentrated exposure to hazards. T. 292..

In December 1996, another RPFCA was completed by a different physician. T. 309–316. The physician found Plaintiff to have the same exertional limitations as determined in the previous examination. T. 310. The physician also opined that Plaintiff had no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. T. 311–313.

### B. Mental Examinations

From January 20, 1995 to February 19, 1995, Plaintiff underwent treatment for alcohol dependency. T. 216–248. A psychiatric evaluation performed during this time revealed that Plaintiff had appropriate behavior and affect, pressured speech, good memory, fair insight and judgment, and average intellect. T. 241–242. The examining psychiatrist opined that Plain-

tiff was very anxious, angry, and depressed about her assault. T. 242.

On September 16, 1995, Plaintiff began treatment with Family Service Agency, Inc. (the "Agency"), where she was treated by Dr. Debra Marcus, Psy.D. T. 272–273. During her initial "intake" visit, Plaintiff reported suffering from physical and emotional problems after years of domestic violence. T. 269. A psychological assessment completed on October 28, 1995 reported that Plaintiff was feeling fragile and emotionally distraught due to past domestic violence and pending court litigation. T. 266. Based on the assessment, Dr. Marcus diagnosed Plaintiff as suffering from post-traumatic stress disorder ("PTSD"). T. 265. One year later, Plaintiff was discharged by Dr. Marcus because Plaintiff no longer contacted the Agency. T. 260. Dr. Marcus noted on the discharge document that Plaintiff had twelve individual counseling sessions with her and that Plaintiff had shown moderate improvement. T. 260.

At some later date, Dr. Marcus completed a Statement of Functional Capacity Form at the request of Plaintiff's long-term disability carrier. T. 334–335. Dr. Marcus reported that Plaintiff received psychological treatment soon after the incident (assault) and substance abuse treatment. T. 334. She reported that Plaintiff reported or exhibited anger outbursts, difficulty concentrating, sleep disturbances, diminished interest/participation in activities, and had recurrent recollection of events (abuse). T. 334. Dr. Marcus opined that Plaintiff was suffering from PTSD and was totally disabled from her occupation or from any occupation. T. 334–335.

On July 18, 1996, Plaintiff presented to Dr. Dean Rotundo, M.D., upon a referral from her orthopedic surgeon. T. 286. She reported that she had developed progressive anxiety and insomnia during the last five years of her relationship with her ex-boyfriend and that those conditions had worsened since the assault. T. 285. During a mental status examination, Plaintiff appeared depressed, tearful with excessive crying, and apprehensive. T. 282. She reported insomnia, decreased appetite that resulted in the loss of forty pounds in six months, decreased concentration, and impaired memory. T. 282. She also stated that she was waiting for the court to settle the case stemming from her assault. T. 286. Dr. Rotundo noted that Plaintiff was experiencing flashbacks, nightmares, and increased anxiety. T. 282. He diagnosed her as having major depression secondary to a tragic life situation, PTSD, interpersonal relationship problems, and insomnia. T. 282. Dr. Rotundo assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 40–50 [1] and prescribed Pamelor. T. 282.

Three weeks later, Plaintiff followed up with Dr. Rotundo and she reported feeling better after beginning the psychotropic medication. T. 281. According to Dr. Rotundo's notes, Plaintiff stated, "I haven't felt good in 7–10 years!—until now—now I can plan things." T. 281. A month later on two separate sessions with Dr. Rotundo, Plaintiff reported that she was feeling apprehensive about an upcoming deposition and that she was "reliving hell" by attending the deposition. T. 280–281. Dr. Rotundo opined that Plaintiff seemed stable despite overwhelming pressure from the "court scene." T. 280.

---

**1.** A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.1994).

Dr. Rotundo completed a RMFCA dated September 20, 1996. T. 353–355. He opined that Plaintiff was "markedly"[2] limited in her ability to: understand and remember detailed instructions; complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and set goals or make plans independently. T. 353–355. He further opined that Plaintiff was "moderately"[3] limited in her ability to: remember locations and work-like procedures; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; sustain ordinary routine without supervision; work in coordination with or proximity to others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and travel to unfamiliar places or use public transportation. T. 353–355. Dr. Rotundo also opined that Plaintiff was "mildly"[4] limited in her ability to: understand and remember one- or two-step instructions; carry out simply, one- or two-step instructions; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and take appropriate precautions. T. 353–354.

Additionally, Dr. Rotundo opined that "due to persistence of major depression and symptoms of PTSD, [Plaintiff was] unable to maintain gainful employment at th[at] time." T. 355.

In a session on November 19, 1996, Dr. Rotundo reported Plaintiff as being anxious and apprehensive, that her back pain persisted, and that there was some response to the Pamelor. T. 277. On December 17, 1996, Plaintiff reported that she was in good spirits because she had received some good news about her lawsuits. T. 358. Dr. Rotundo noted that Plaintiff's anxiety and panic symptoms continued secondary to post-traumatic phenomenon and that she remained preoccupied with her assault. T. 358. He also noted that Plaintiff was somewhat isolative, even fearful of a ringing telephone when she thought about the past. T. 358. In February 1997, Plaintiff continued to complain of depression, anxiety, and apprehension relating to her current situation and her future court battle. T. 357. She also complained of insomnia, restlessness, racing thoughts, and decreased tolerance. T. 357. Consequently, Dr. Rotundo increased her dosage of Pamelor. T. 357. The following month, Dr. Rotundo noted that Plaintiff seemed more enthusiastic and better able to understand her pending legal situation. T. 357. He also noted that the anxiety, apprehension, and depression persisted. T. 357.

An assessment of Plaintiff's psychiatric impairments was prepared by Dr. Jackie C. Robinson, Ph.D., a consulting psychologist, through the completion of a Psychiatric Review Technique Form dated Novem-

**2.** For purposes of this assessment, "markedly" limited is defined as effectively precludes the individual from performing the activity in a meaningful manner. T. 353.

**3.** For purposes of this assessment, "moderately" limited is defined as significantly affects

but does not totally preclude the individual's ability to perform the activity. T. 353.

**4.** For purposes of this assessment, "mildly" limited is defined as does not significantly affect the individual's ability to perform the activity. T. 353.

ber 4, 1996. T. 296–304. Dr. Robinson opined that Plaintiff had a disturbance of mood as evidenced by sleep disturbances, psychomotor agitation or retardation, decreased energy, and difficulty concentrating or thinking. T. 299. Dr. Robinson also found anxiety as the predominant disturbance or anxiety experienced in an attempt to master symptoms, as evidenced by Plaintiff's recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. T. 300. In opining that Plaintiff had an anxiety related disorder, Dr. Robinson found that Plaintiff did not have: generalized persistent anxiety; a persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week; or recurrent obsessions or compulsions which are a source of marked distress. T. 300.

In addition, Dr. Robinson opined that Plaintiff's activities of daily living were slightly restricted and her maintenance of social functioning was slightly difficult. T. 303. Dr. Robinson further opined that Plaintiff often had deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in a work setting or elsewhere) and that she never had episodes of deterioration or decompensation in work or in work-like settings that caused her to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include-deterioration or adaptive behaviors). T. 300.

Dr. Robinson prepared a RMFCA dated November 4, 1996. T. 305–307. The same or similar form was completed by Dr. Rotundo on September 20, 1996, as previously described. Dr. Robinson opined that Plaintiff was mildly limited in her ability to: remember locations and work-like procedures; understand and remember very short and simple instructions; understand and remember detailed instructions; carry out very short and simple instructions; carry out detailed instructions; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. T. 305–306.

Dr. Robinson found that Plaintiff was moderately limited in her ability to: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and accept instructions and respond appropriately to criticism from supervisors. T. 305–306. Dr. Robinson concluded by reporting that Plaintiff "continues to have some difficulty with concentrating, depression, high anxiety, which can affect sustainability and (sic) painful circumstances but seems to be responding well to treatment." T. 307.

On December 28, 1996, a similar examination was performed by a different consulting physician (name illegible). T. 317–

325. The physician found that Plaintiff suffered from depression and anxiety, but concluded that "[her] impairment [was] not severely interfering with mental capacity for simple, repetitive, and sustained tasks." T. 318. In a similar evaluation to that completed by Dr. Robinson, the physician had similar findings, except that he opined that Plaintiff seldom had deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in a work setting or elsewhere). T. 324.

## II. Plaintiff's Testimony

### A. *October 15, 1997 Hearing*

Plaintiff, 45 years of age, testified that the last time she was employed was on December 9, 1994, when she worked as an insurance sales representative. T. 47. She also had previous work experience as a restaurant owner and a bank supervisor. T. 48–49. Plaintiff completed high school and took some undergraduate classes, without obtaining a degree. T. 46.

According to Plaintiff, physical and mental problems resulting from a domestic assault prevented her from working. T. 50, 54. Plaintiff testified that her left leg "[gave] out" all of the time, collapsing without notice about two or three times per day and causing her to fall, sometimes two or three times per week. T. 50–51. Plaintiff also stated that she had pinched nerves in her spine. T. 50. As a result of her spinal injury, Plaintiff had problems sitting for more than twenty minutes at a time because of numbness and pinching in her left leg. T. 58. She testified that as she was giving her testimony at this hearing, her left shin was numb. T. 58. Plaintiff also had trouble standing for more than fifteen minutes at a time because of tremors, twitches, and numbness. T. 58.

Plaintiff also testified that she suffered emotional problems stemming from her abusive relationship with her ex-boyfriend.

T. 54. She suffered from PTSD, which manifested itself through nightmares that occurred as often as four times per week and caused her to be unable to sleep. T. 54. She stated that she had anxiety attacks and negative reactions from being in crowds of people or even from hearing the phone ring. T. 55. She also testified to having frequent crying fits. T. 56. As a result of these manifestations, Plaintiff sought psychological counseling and was prescribed psychotropic medications for her symptoms. T. 57. Plaintiff suffered from headaches and dizzy spells as side affects from her medication, but was not sure whether the dizzy spells were caused by the medication or by anxiety or by a combination of both. T. 56. Plaintiff treated the headaches with Tylenol and put cold compresses on her forehead and on the back of her neck. T. 53–54. She also had difficulty concentrating and focusing. T. 57. Plaintiff also testified that her anxiety sometimes caused her to lash-out at other people, usually by screaming for no reason. T. 57.

Plaintiff testified that she did not do any cleaning or cooking and did minimal lifting. T. 59. Her typical day consisted either of reading, watching television, or resting. T. 59. The only social activity in which she participated was attending a group meeting for abused women, which she attended for about eight months. T. 59. She ceased this activity because attending the group depressed her too much. T. 60.

### B. *May 19, 1999 Supplemental Hearing*

In accordance with the Appeals Council decision, a supplemental hearing was held before the ALJ. Plaintiff testified that she had returned to work in November 1997 as an assistant vice president for a bank where she was in charge of operations and sales. T. 69. According to her testimony,

her employer was aware of the situation she had been going through since 1994 and was very supportive. T. 69. Her employer worked with her through her absenteeism and during her fits of depression, and allowed her unscheduled days off to go for physical and psychological therapy and meetings with Women in Distress. T. 70. She testified that it was about eight months before she was able to completely fulfill her duties at the bank. T. 70.

Plaintiff claimed that she could not have performed this type of work prior to November 1997 for a couple of reasons. T. 71. First, she could not drive (and could not drive as of the date of the hearing) because of her back injury and because of the occasional numbness and spasms in her left leg. T. 71. Her husband took her to work and took her to calls in the field. T. 71. Second, she could not have worked prior to November 1997 because of her emotional problems: her constant fits of depression, crying, not getting out of bed or getting dressed, and lack of sleep. T. 71. Her medication made her drowsy and lethargic during the day, she did not open mail, and she disconnected all the phones in her house because she could not stand the ringing of phones. T. 71. Once again, Plaintiff stated that it was because of her supportive employer that she was able to return to work. T. 72.

### III. Testimony of the Vocational Expert

Vocational expert Lee Tomson (the "VE") also testified at the supplemental hearing. The ALJ asked the VE to consider a hypothetical claimant who was the same age as Plaintiff, who possessed the same education and work experience, who would be restricted to lifting no more than ten pounds, who could stand eight hours, four of which without interruption, and who could sit eight hours, four of which without interruption. The hypothetical claimant would occasionally be able to climb, balance, stoop, crouch, and kneel, but never crawl. Other physical functions such as reaching, handling, feeling, and pushing would have no restrictions. There would be no environmental restrictions and the hypothetical claimant would be restricted to simple repetitive tasks. T. 75–76.

The VE testified that such an individual would not be able to perform any of the work that Plaintiff had performed in the past. T. 76. Three jobs that the VE identified that the hypothetical claimant would be able to perform were an assembler of small parts, a buffing machine tender, and a sorter. T. 77. When asked by Plaintiff's counsel to take into account the non-exertional limitations imposed by Dr. Rotundo, the VE testified that even with those specific limitations, the hypothetical claimant/Plaintiff would be able to perform the jobs he had identified. T. 84–85. The VE noted that the biggest issue might be that of punctuality or regularity. T. 83. He testified that if the hypothetical claimant/Plaintiff was moderately limited in her ability to maintain regular attendance and be punctual within customary tolerance, the hypothetical claimant/Plaintiff would be late four out of five days per week and "she'[d] probably not ... keep the job." T. 82–84. He added that if she were to be late one or two times per week, she would keep the job. T. 84. In addition, the VE testified that the jobs he identified existed in such significant numbers that even if workers were terminated, they could rotate through them. T. 85–86.

## DISCUSSION

### I. Scope of Review

The scope of judicial review of factual findings in a disability case is limited to a determination of whether the findings are supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2003); *see also Brown v.*

*Sullivan,* 921 F.2d 1233, 1235 (11th Cir. 1991); *Martin v. Sullivan,* 894 F.2d 1520, 1529 (11th Cir.1990). Substantial evidence is more than a mere scintilla; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir.1997) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). Even if this Court finds that the preponderance of the evidence weighs against the Commissioner's decision, an affirmance is required if the decision is supported by substantial evidence. *Barnes v. Sullivan,* 932 F.2d 1356, 1358 (11th Cir.1991). In determining the existence of substantial evidence, the Court must scrutinize the entire record, taking into account evidence both favorable and unfavorable to the [Commissioner's] decision. *Bridges v. Bowen,* 815 F.2d 622, 624 (11th Cir.1987). The Commissioner's failure to apply the correct legal standards or to provide the reviewing Court with a sufficient basis for a determination that proper legal principles have been followed mandates reversal. *Foote v. Chater,* 67 F.3d 1553, 1558 (11th Cir.1995); *Barnes,* 932 F.2d at 1356; *Martin,* 894 F.2d at 1529.

## II. Analysis of Disability/ALJ's Findings

Regulations promulgated by the Commissioner establish a five-step analysis to determine disability. 20 C.F.R. § 404.1520 (2003). If the claimant is employed during the period in question, a finding of non-disability is made, and the inquiry ends. 20 C.F.R. § 404.1520(b). At step two, a determination is made whether the claimant suffers from a severe impairment or combination of impairments; if no severe impairment is found, the claimant is deemed not disabled. 20 C.F.R. § 404.1520(c). If step three is reached, a comparison is made between the claimant's impairments and those list-ed in 20 C.F.R. § 404, Subpart P, Appendix 1(2003). If the impairment meets or equals those contained in the listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). The fourth step involves a determination as to whether the impairment prevents the claimant from performing past relevant work. The claimant has the initial burden of showing the inability to perform previous work. *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir.2001); *Lucas v. Sullivan,* 918 F.2d 1567, 1571 (11th Cir.1990). If this showing is made, then the burden shifts to the Commissioner to prove the existence of other types of substantial gainful employment in the national economy that the claimant can perform. *Allen v. Bowen,* 816 F.2d 600, 601 (11th Cir. 1987); 20 C.F.R. § 404.1520(e), (f).

In the instant case, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the closed period commencing December 9, 1994 and ending September 1, 1997. T. 23. The ALJ further found that the Plaintiff was significantly limited in her ability to perform basic work activity due to medically determinable impairments, but that the impairments did not meet or equal the criteria of any listed impairment. T. 23.

In examining Plaintiff's alleged psychological problems, the ALJ found that Plaintiff's subjective complaints were not "fully credible." T. 19. First, Plaintiff stated that after she began taking Pamelor, an antidepressant, she felt better than she had in seven to ten years and was able to plan things. T. 19. Although she alleged side effects from the medication, she reported only positive results to her treating psychiatrist. T. 19. Plaintiff also testified that she could not stand to be around people or to be in crowds, yet she testified that she was able to get along with people in authority and with the public. T. 20.

The ALJ noted that while Plaintiff claimed to have problems with her memory, her treating psychiatrist reported that her thought processes were cogent and that her memory was intact. T. 20. He also noted that while Plaintiff claimed to have problems with concentration, she was able to read and watch television for recreation. T. 20.

The ALJ found the exertional work restrictions to be the following: lifting no more than five to ten pounds; standing eight hours a day (four hours without interruption); sitting eight hours a day (four hours without interruption); never crawling; occasionally climbing, stooping, kneeling, and balancing; and a limitation to simple, repetitive tasks. T. 22. The report indicated that Plaintiff had no restrictions in handling, fingering, or grasping, and no restrictions of environment. T. 22. The ALJ concurred with the report prepared by Plaintiff's treating psychiatrist, which indicated that Plaintiff was able to perform simple, repetitive tasks. T. 21. However, the ALJ disagreed with Dr. Rotundo's opinion that Plaintiff could not complete a normal workweek and work independently. T. 21. As a basis for his conclusion, the ALJ provided the following reasoning:

> In reducing the residual functional capacity to that described above ... the undersigned cannot adopt [Dr. Rotundo's] conclusions that claimant could not complete a normal work week and work independently. The undersigned notes that Dr. Rotundo's progress notes focus on claimant's court involvement rather than problems related to stress or depression. There is no record of any hospitalizations or emergency room treatment for anxiety attacks or depression. [C]laimant continued to apply for jobs during the period in question and

eventually returned to work as an assistant vice president of a bank.
T. 21.

Based on an exertional capacity for sedentary work, Plaintiff's age, education, and past work experience, the ALJ concluded that a finding of "not disabled" would be reached by application of Medical–Vocational Rule 201.21. T. 22. Although the ALJ found that Plaintiff was unable to perform her past relevant work, he adopted the VE's testimony that Plaintiff was capable of making a vocational adjustment to work as a sorter—a job that exists in significant numbers in the national economy. T. 22. Ultimately, the ALJ concluded that "[b]ecause Plaintiff was capable of making an adjustment to other work, she was not then disabled within the meaning of the Social Security Act." T. 22.

### III. Treating Physician

■ Plaintiff argues that the ALJ erred in failing to afford controlling weight to Dr. Rotundo's opinion. The opinion of a treating physician is entitled to substantial weight unless good cause exists for not heeding the treating physician's diagnosis. *Falge v. Apfel,* 150 F.3d 1320, 1322 (11th Cir.1998); *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir.1997); *Edwards v. Sullivan,* 937 F.2d 580, 583 (11th Cir.1991). The Commissioner cannot discount the treating doctor's opinion where medical evidence does not conclusively counter the treating physician's opinion and no other good cause is shown. *Schnorr v. Bowen,* 816 F.2d 578, 581 (11th Cir.1987); *Hillsman v. Bowen,* 804 F.2d 1179, 1182 (11th Cir.1986). A treating physician's opinion may be disregarded, however, if it is unsupported by objective medical evidence or is merely conclusory. *Johns v. Bowen,* 821 F.2d 551, 555 (11th Cir.1987); *Bloodsworth v. Heckler,* 703 F.2d 1233, 1240 (11th Cir. 1983). The ALJ must specify what weight

is given to a treating physician's opinion and must specify any reasons for giving it no weight. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir.1986). If the ALJ ignored or failed to properly refute a treating physician's opinion, the testimony must be taken as true as a matter of law. *Id.*

Plaintiff asserts that as a result of the years of emotional and physical abuse at the hands of her ex-boyfriend, and the legal proceedings surrounding it, she developed PTSD and a major depressive disorder. Plaintiff argues that the ALJ failed to see the connection between her court involvement and her disability, that is, but for the domestic abuse there would be no court case or disability claim. For the reasons discussed below, the Court agrees that the ALJ's justifications for rejecting Dr. Rotundo's opinion that Plaintiff could not complete a normal workweek and work independently are inadequate and are not supported by substantial evidence.

First, the ALJ's conclusion that Dr. Rotundo's progress notes focus on Plaintiff's court involvement rather than problems related to stress or depression is not supported by substantial evidence. There is no question that there are references to Plaintiff's court involvement contained in Dr. Rotundo's progress notes. However, there is substantial evidence contained in the progress notes indicating Plaintiff's problems related to stress or depression. In addition to Dr. Rotundo diagnosing Plaintiff as suffering from PTSD, major depression (secondary to a tragic life situation), and insomnia, the notes indicate how Plaintiff was suffering from, among other things, nightmares, restlessness, apprehensiveness, flashbacks, racing thoughts, decreased tolerance, and anxiety. Furthermore, Dr. Rotundo concluded that "[Plaintiff] remains preoccupied with the

incident that brought her here," and that Plaintiff was "somewhat isolative—even fearful of phone calls when she [thought] about [the] past." [5] While it may be true that Plaintiff's court involvement contributed to her mental infirmities as noted by Dr. Marcus in an earlier report, there is no indication in the record that Plaintiff sought treatment from Dr. Rotundo solely because of her court involvement.

The notes of her initial session with Dr. Rotundo indicate that Plaintiff developed progressive anxiety and insomnia during the last five years of her relationship and how those symptoms worsened since her assault. The progress notes also indicate that Plaintiff lost forty pounds in six months due to decreased appetite. Moreover, Dr. Rotundo assigned Plaintiff a GAF score of 40–50. It is also worth noting that the progress note reflecting Plaintiff's initial evaluation with Dr. Rotundo focused extensively on her assault and her relationship with her ex-boyfriend—Dr. Rotundo wrote only one sentence pertaining to Plaintiff's court involvement. Based on the foregoing reasons, the ALJ's justification for rejecting Dr. Rotundo's opinion based on the progress notes is not supported by substantial evidence in the record.

The ALJ also rejected Dr. Rotundo's opinion on the basis that there is no record of any hospitalizations or emergency room treatment for anxiety attacks or depression. Although hospitalizations may add to the strength of a disability claim, "[they] are not an essential element in establishing a severe impairment." *Stanwood v. Bowen*, 643 F.Supp. 990, 992 (D.Me.1986). The lack of hospitalizations or emergency room treatment may be an adequate justification where the record is devoid of any other

5. Dr. Robinson found that Plaintiff's "recurrent and intrusive recollections of a traumatic experience" was a source of marked distress.

evidence that would tend to add credence to the disability claim. Here, however, the record is not devoid of such evidence. For instance, Plaintiff was under the care of Dr. Rotundo and was also taking psychotropic medication. The nature of the medication and the Plaintiff's use thereof militate against the possibility that Plaintiff would have to be admitted to the hospital for her psychological impairments.[6] Therefore, weighed against the record as a whole, the fact that there is no evidence that Plaintiff was hospitalized or received emergency room treatment is an inadequate justification for rejecting Dr. Rotundo's opinion.

Plaintiff's search for jobs during the closed period is also an inadequate justification for rejecting Dr. Rotundo's opinion in light of the evidence contained in the record. It has been held that a claimant who applies for jobs during a claimed period of disability indicates that the claimant did not view his pain as disabling. *See Bentley v. Shalala,* 52 F.3d 784, 786 (8th Cir.1995). However, the *Bentley* Court also noted parenthetically that an unsuccessful work search may even reinforce a disability claim where the medical evidence uniformly supports a finding of disability. *Id.; see also King v. Apfel,* 991 F.Supp. 1101, 1108–1109 (E.D.Mo.1997) (claimant who sought work during claimed period of disability does not compel a determination that claimant was not disabled); *but see Hays v. Apfel,* No. Civ.A. 98–2113–KHV, 1999 WL 450902, *6 (D.Kan. May 10, 1999) (medical evidence did not uniformly support a finding of disability where claimant sought employment during claimed period of disability but claimant's physicians did not find him unable to work).

Plaintiff's unsuccessful employment search during the closed period reinforces her disability claim, since the medical evidence uniformly supports a finding of disability. In addition to her physical impairments, Plaintiff was diagnosed as suffering from a litany of psychological disorders, including PTSD, major depression, anxiety, and insomnia. Furthermore, Dr. Rotundo concluded that Plaintiff was markedly limited in her ability to complete a normal workweek and work independently. Accordingly, Plaintiff's search for jobs during the closed period is not an adequate justification for rejecting Dr. Rotundo's opinion.

Finally, the ALJ concluded that he could not accept Dr. Rotundo's opinion that Plaintiff could not complete a normal workweek and work independently because Plaintiff returned to work as an assistant vice president of a bank after the closed period. A Ninth Circuit decision, *Moore v. Comm'r of the Social Sec. Admin.,* 278 F.3d 920 (9th Cir.2002), is strikingly analogous to the case at bar. There, a developmentally disabled claimant was thrust into a period of severe depression following his mother's death. Over two years after filing his initial application for disability benefits, he began working as a car washer and thus, amended his disability application to request benefits only for the closed period predating his employment. Two psychologists and one psychiatrist agreed that the claimant was markedly impaired in his ability to, *inter alia,* sustain an ordinary work routine and complete a workday without interruptions from symptoms. The claimant testified that he thought he could have done the job before the death of his mother, but his depression prevented him from working. He also stated that he was able to begin working only through the assistance of an

---

**6.** The Court does not suggest that the medication was a "cure-all," considering that Plaintiff still suffered from her impairments

as indicated by Dr. Rotundo's progress notes and Plaintiff's testimony.

accommodating employer. In denying his application, the ALJ determined that the testimony of the claimant's examining physicians supported his application, but rejected that testimony based on the claimant's work history after the end of the closed period of disability for which he was applying.

In reversing the ALJ's decision (and the district court's affirmance thereof), the Ninth Circuit held that

> an applicant's employment that begins after the end of the closed period for which the applicant is seeking disability benefits, unless wholly inconsistent with the claimed disability, is not a "specific and legitimate" reason for rejecting the opinions of examining physicians that an individual is disabled.

*Id.* at 925. The court concluded that the evidence showed that the claimant was disabled by severe depression following his mother's death and gradually recovered to the point, over two years later, where he was able to function in a job requiring minimal skills. *Id.* The fact that the claimant had not been prescribed medication, drove to a doctor visit, completed a math class, and completed basic activities of daily living such as watching television and performing odd jobs were also not adequate reasons, according to the court, for rejecting the testimony of the claimant and his physicians regarding his inability to work in the wake of his mother's death. *Id.* at 925, n. 2.

In the instant case and like the claimant in *Moore,* Plaintiff's mental impairments began (or at least were exacerbated) after a traumatic event (i.e., being assaulted by her ex-boyfriend), she was found by Dr. Rotundo to be markedly impaired in her ability to complete a normal workweek without interruptions from psychologically based symptoms, and she was only able to begin working again because of an accommodating employer—Plaintiff's employer was aware of her situation and allowed her to take unscheduled days off to attend physical and psychological therapy and to attend Women in Distress. Moreover, unlike the claimant in *Moore,* Plaintiff was prescribed medication to treat her mental conditions. Based on the similarities of *Moore* and the case at bar and the rationale provided by the Ninth Circuit, the Court concludes that the ALJ's justification that Plaintiff returned to work after the closed period is inadequate for rejecting Dr. Rotundo's opinion.

Accordingly, the Court concludes that the ALJ did not properly refute Dr. Rotundo's opinion that Plaintiff could not complete a normal workweek and work independently. Therefore, Dr. Rotundo's opinion must be taken as true as a matter of law and the decision of the Commissioner must be reversed and remanded for the awarding of benefits.

## IV. Testimony of Vocational Expert

Even if reversal were not required, the Court would remand the case for further clarification of the VE's testimony regarding Plaintiff's employability. After considering Plaintiff's exertional and non-exertional limitations, the VE testified that the hypothetical claimant/Plaintiff would be able to rotate through jobs as she was fired due to her poor attendance and tardiness. In his decision, the ALJ ignored this testimony, but rather focused on the VE's testimony that Plaintiff "was capable of making a vocational adjustment to work as a sorter." In reviewing the VE's testimony, the Court expresses concern over the following testimony of the VE:

> Atty: If the claimant was limited in her ability, if she was moderately limited ... in all of the following areas in combination ... the ability to perform activities within a schedule, maintain regular attendance and be punctual within custom-

ary tolerance [plus other non-exertional limitations] ... If she was moderately limited in all of those areas, would she be able to perform the jobs that you have identified here today?

VE: I think she would ... The biggest issue might be that of some punctuality or regularity, the middle ground that you were talking about. If that became extreme versus moderate, there could be some problem with employment ... The type of work it is is such that you don't expect perfect attendance or outstanding performance by those performing the work. It is work that is, that needs to be done, but does not draw a particularly highly reliable employee to do it. So there tends to be a lot of turnover in any case and because of that, there is some latitude allowed as far as attendance and punctually (sic) is concerned.

Atty: Latitude, how extensive is the latitude because again for purposes of my question, moderately limited was defined as it significantly affects.

VE: Correct. I understood that to be the case. The significantly means that she's going to be late four out of five days a week, she's probably not going to keep the job. If she's going to be late two out of five days a week, she's probably going to keep the job, but not tolerate reprimands too well, but do the job when she is present within all of these moderate limitations that you listed for me so someone else would have to decide just how much attendance she's going to have. If it's two out of five, it's not going to be unemployable. If it's three or four out of five, then obviously she would be changing jobs rapidly.

\*　　\*　　\*　　\*　　\*　　\*

Atty: And just so I understand your testimony to the prior question was that you would reduce your numbers by 10 percent of, so in essence approximately 90 percent of employers would tolerate her to be tardy on a weekly basis.

VE: In this kind of work they would. Other kinds of work they wouldn't, but this particular type where you need people to do the work, it's not a job that draws or demands high skills, then these people tend to be somewhat more unreliable than others and therefore that's tolerated within that part of the industry.

Atty: On a weekly basis?

VE: On an every day basis.

Atty: The same employees being tardy or by however long two days a week on a weekly basis? Employers would tolerate that?

VE: This particular work which is essentially work and repetitive tasks, trying to find somebody to do it and stay with it. Yes. They would, particularly in today's market you would find that more prevalent.

Atty: But then your testimony is if it was ... if she was going to be tardy up to three days a week or more, that then the tolerance falls off.

VE: Tolerance ius (sic) going to fall off.

Atty: To where the person would not be able to maintain a job.

VE: Not that particular job. They'd be changing jobs a lot. The kinds of jobs I'm mentioning exist in significant numbers where they could rotate through them. So they could gain a job, lose a job, gain a job, lose a job always with the same poor attendance and poor ability to be there with this more than three days a week attendance problem, but they would always be able to be hired again for another job, and that comes down to a cycle they get tied up in. T. 83–86.

The Court is primarily concerned about the internal conflict and ambiguity con-

tained in the foregoing excerpts of the VE's testimony. For example, the VE testified that if the inability to be punctual became extreme versus moderate, there could be some problems with employment. Later and with the understanding that "moderately limited" was defined as "significantly affects," the VE testified that Plaintiff was going to be late four out of five days per week and would probably not keep the job. Based on this testimony, it would not take an extreme inability, but a moderate inability, to be punctual for Plaintiff to be possibly unemployable. The VE continued by stating that if Plaintiff were to be late only two times per week, she would be employable. Because the terms "moderate" or "significant" have not been specifically defined by any medical expert as to the exact amount of days Plaintiff would be absent from work, this, combined with the VE's testimony make it unclear whether Plaintiff was employable or not. Thus, it is unclear to the Court whether it is the opinion of the VE that Plaintiff would be late three or more times per week and therefore not be able to keep a job, or whether it is the opinion of the VE that Plaintiff would be late less than three times per week and therefore be able to keep a job.

■ The issue of whether Plaintiff would have been able to keep a job without "rotating" through them is also of significant import. Under the Social Security Act, disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2003). Further, "substantial gainful activity" is defined as

[w]ork activity that is both substantial and gainful: (a) Substantial work activity: Substantial work activity is work activity that involves doing significant physical or mental activities. [The claimant's] work may be substantial even if it is done on a part-time basis or if [the claimant] do[es] less, get[s] paid less, or [has] less responsibility than when [the claimant] worked before, (b) Gainful work activity. Gainful work activity is work activity that [the claimant] do[es] for pay or profit ....

20 C.F.R. § 404.1572 (2003). The Social Security Administration generally considers a work effort lasting three months or less because of the claimant's impairments as an unsuccessful work attempt and thus, it is not considered evidence of an ability to engage in substantial gainful activity.[7] *See* 20 C.F.R. §§ 404.1574(a)(1), 416.974(a)(1) (2003); SSR 84–25, 1984 WL 49799 (1984). Several courts have addressed the issue of whether a claimant's inability to hold or maintain a job for significant periods of time because of the claimant's impairment constitutes substantial gainful activity within the meaning of the Social Security Act. Although this question does not appear to have been addressed in a reported decision by the Eleventh Circuit, based on the reasoning provided by other courts, this Court finds that a claimant's inability to hold or maintain a job for significant periods of time because of the claimant's impairment does not constitute substantial gainful activity within the meaning of the Social Security Act.

One of the leading cases on this issue is *Singletary v. Bowen*, 798 F.2d 818 (5th Cir.1986). There, the claimant had been sporadically employed and spent consider-

---

**7.** In order for a work attempt to be considered unsuccessful, the attempt must be preceded by a period of unemployment of at least 30 consecutive days or was forced to change to another type of work or another employer. SSR 84–25 (1984).

able amounts of time in hospitals and mental institutions. Doctors concluded that he had serious, long-term mental impairments. In denying his application and notwithstanding his psychological disorders, the administrative law judge found that the claimant was able to engage in substantial gainful activity because he was capable of performing work, such as dishwashing, which he had done in the past. Noting that there was substantial evidence to support the claimant's contention that he was unable to hold a job, the Fifth Circuit held that

> [a] finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time.

*Id.* at 822. (emphasis in original). Several other courts have imposed this durational requirement on the concept of substantial gainful activity. *See, e.g., Gatliff v. Comm'r of the Soc. Sec. Adm.*, 172 F.3d 690, 691 (9th Cir.1999) ("A string of sequential, short-term jobs [less than two months] does not constitute substantial gainful activity under the Social Security Act"); *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir.1994) (quoting *Singletary* standard); *Dix v. Sullivan*, 900 F.2d 135, 138 (8th Cir.1990) (reversing and remanding for award of benefits where claimant was "not capable of holding a job for a significant period of time"); *Pagan v. Bowen*, 862 F.2d 340, 350 (D.C.Cir.1988) ("The critical question is not whether the claimant has been stable enough to work for short periods, but whether he or she is able to hold whatever job he finds for a significant period of time") (internal quotations omitted) (quoting *Singletary*, 798 F.2d at 822); *Kangas v. Bowen*, 823 F.2d 775, 778 (3rd Cir.1987) (reversing and re-

manding where ALJ failed to evaluate the effect of claimant's frequent hospitalizations on his ability to perform any work on a "regular, continuing or sustained" basis); *Parish v. Califano*, 642 F.2d 188, 192 (6th Cir.1981) ("The phrase 'substantial gainful activity' implies employment with some degree of regularity"); *Wilson v. Richardson*, 455 F.2d 304, 307 (4th Cir.1972) (claimant's holding eleven jobs in three years "may demonstrate not his ability, but his inability to engage in substantial gainful activity"); *Williams v. Apfel*, 73 F.Supp.2d 1325, 1341 (M.D.Fla.1999) (quoting *Singletary* standard).

In addition to the foregoing, the Court is particularly persuaded by the following reasoning, especially as it applies to claimants with psychological disabilities:

> Unlike a physical impairment, it is extremely difficult to predict the course of mental illness. Symptom-free intervals, though sometimes indicative of a remission in the mental disorder, are generally of uncertain duration and marked by an impending possibility of relapse. Realistically, a person with a mental impairment may be unable to engage in competitive employment, as his ability to work may be sporadically interrupted by unforeseeable mental setbacks.

*Singletary*, 798 F.2d at 821 (quoting *Lebus v. Harris*, 526 F.Supp. 56, 61 (N.D.Cal. 1981)).

It is clear from the holdings in the aforementioned decisions that sporadic employment does not constitute "substantial gainful activity" within the purview of the Social Security Act. Furthermore, the Social Security Administration considers jobs that end within three months because of the claimant's impairments to be "unsuccessful work attempts," and does not consider such short-term jobs as evidence of an inability to engage in substantial employment. *Gatliff*, 172 F.3d at 694. Ac-

cordingly, the Court adopts the holding that substantial gainful activity not only means the ability to locate and physically perform a job, but also the ability to maintain the job for a significant period of time. *Singletary*, 798 F.2d at 822.[8] Thus, substantial gainful activity does not include "rotating" through jobs.

In light of the Court's holding, it would have been paramount to erase the ambiguity contained in the VE's testimony. As a result, the Court would remand the case to further develop the record as to Plaintiff's ability, during the closed period of December 9, 1994 to September 1, 1997, to complete a normal workweek.

## V. Subjective Complaints of Pain and Dysfunction

■ The Court rejects Plaintiff's argument regarding the ALJ's treatment of her subjective complaints. In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition and (2) either (a) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (b) that the objectively

determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.1991). A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court. *Foote*, 67 F.3d at 1562; *MacGregor*, 786 F.2d at 1054.

Plaintiff argues that the ALJ not only failed to apply the two-prong standard for evaluating Plaintiff's testimony regarding her pain, but also failed to state a reasonable basis for the rejection of such testimony. The Court finds that the ALJ properly applied the Eleventh Circuit's pain standard.[9]

As far as the Plaintiff's subjective complaints are concerned, the Court concludes that the ALJ articulated a reasonable basis for finding that the complaints were not fully credible.[10] Accordingly, the Court will not disturb these findings.

### CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** as follows:

8. Indeed, the phrase "significant period of time" is not precisely defined. The court in *Singletary* did not specify how long the claimant could hold a job, only that he was unable to maintain employment for "long periods of time," "significant periods of time," and "more than limited periods of time." *Gatliff*, 172 F.3d at 693, n. 3.

9. Although the ALJ does not directly cite or refer to the language of the three-part pain standard in *Holt*, he concluded that Plaintiff's impairments were severe, but did not meet or equal the criteria of any of the impairments listed in the Regulations. Moreover, the ALJ cited to 20 C.F.R. § 404.1529, which contains the same language regarding the subjective pain testimony that courts have interpreted when initially establishing the three-part pain standard. *Wilson*, 284 F.3d at 1226.

10. Plaintiff testified that she could not stand to be around people or be in crowds, yet reported getting along well with people in authority and with the public; when Plaintiff began taking Pamelor, she stated that she felt better than she had in seven to ten years and that she was able to plan things; she alleged to have memory problems, yet Dr. Rotundo reported that Plaintiff's thought processes were cogent and her memory was intact; she reported problems with concentration, but was still able to read and watch television for recreation; Plaintiff reported that her condition prevented her from doing shopping or household chores, yet she indicated on a disability report that since the onset of her condition, her ability to perform household chores *had not* changed.

1. Plaintiff's motion for summary judgment is **GRANTED**;

2. Defendant's motion for summary judgment is **DENIED**; and

3. **FINAL JUDGMENT** is hereby entered in favor of Plaintiff, and the decision of the Commissioner is **REVERSED** and **REMANDED** for the awarding of benefits.